## Case No. 15,867.

### UNITED STATES v. NEW BEDFORD BRIDGE.

[1 Woodb. & M. 401;[1] 10 Law Rep. 127.]

Circuit Court, D. Massachusetts. April 15, 1847.

NAVIGABLE WATERS—BUILDING BRIDGE—OBSTRUC-
TION TO NAVIGATION—CONSTITUTIONAL GRANT
OF POWER—CONTEMPTS.

1. In an indictment against a corporation for obstructing the navigation of a river, but which had been authorized by a state law, the construction as to its acts must be liberal in its favor. Nothing can be deemed an offence by such a corporation in the courts of the United States, except what has been made so by the constitution, or a treaty, or an act of congress. These courts being of limited jurisdiction under a government of limited powers, a case must be clearly within its jurisdiction, or it will be dismissed, whenever and however the objection is made.

[Cited in Heriot v. Davis, Case No. 6,404.]

2. A grant of power to congress, probably, does not prevent the states from continuing to act on subjects within the grant till congress legislates fully concerning it, and so as to conflict with the doings of the state, unless there is an express prohibition on the states to act further in the matter, or it is implied strongly from the nature of the case. Where the states do not grant to congress powers over their internal commerce or police, those powers can continue to be exercised to any extent by them till they conflict with the proper exercise by congress of other powers, which are granted to it, such as those over foreign commerce and the revenue, and then the acts of the state, so far as repugnant and conflicting with the due exercise of the other powers by congress, must yield.

[Cited in Perry Manuf'g Co. v. Bowen, Case No. 11,015; Passenger Cases, 7 How. (48 U. S.) 524, 537, 540, 553, 559, 561.]

[Cited in City of Chicago v. McGinn, 51 Ill. 273.]

3. A grant of powers to congress, in the constitution, over certain subjects, does not invest any particular courts with that authority till congress confer it by a law, except in some specified powers given in the constitution to the supreme court.

[Cited in Passenger Cases, 7 How. (48 U. S.) 563.]

[Cited in People v. Wilson, 64 Ill. 225; State v. Mathews, 37 N. H. 453. Cited in brief in Ex parte Davis, 41 Me. 45. Cited in Ex parte Dalton, 44 Ohio St. 150, 5 N. E. 136.]

4. The authority to punish for contempt is granted as a necessary incident in establishing a tribunal as a court. The common law cannot be resorted to for aid in giving jurisdiction in the courts of the United States, but only in deciding certain questions after jurisdiction is otherwise obtained.

5. The grant of power to congress to regulate foreign commerce, and the declaration that the judicial power shall extend to all cases of admiralty and maritime jurisdiction, do not enable a court to punish any act as a crime, unless some part of the constitution, or a treaty, or some law of congress, makes it a crime,

and confers authority on that court to punish it.

[Cited in Hathaway v. Roach, Case No. 6,-213.]

[Cited in Com. v. New Bedford Bridge, 68 Gray, 347; Sweeney v. Chicago. M. & St. P. Ry. Co., 60 Wis. 68, 18 N. W. 756.]

6. The act of 1789 (chapter 20), as to the powers of the circuit court, neither makes such act a crime, nor confers on this court authority to punish the erection of a bridge over tide water, or the obstruction of navigation in navigable waters. Semble, it might have done the last, if it had been declared to be a crime. Nor to the treaties with foreign powers, allowing ingress and egress to our ports for trade, do either: nor the acts of congress creating the port, where the obstruction is, a port of entry; or making a collection of duties there; or giving coasting licenses; or punishing breaches of the revenue laws. The old states had, before the constitution, sovereign power over tide waters, as well as others navigable, and could obstruct them by bridges or otherwise, whenever they deemed it demanded by the public interests. They still retain the powers before possessed, except where granted to congress and legislated on, unless prohibited. But individuals could not obstruct them, without being liable at common law in most of the states to a prosecution for a nuisance. If individuals owned the soil beneath or adjoining such rivers, it was subject to the easement of navigation by the public, the jus publicum being not inconsistent with the jus privatum in the soil.

[Cited in U. S. v. Staly, Case No. 16,374; Passenger Cases, 7 How. (48 U. S.) 557, 564; Selliman v. Hudson River Bridge Co., Case No. 12,852; The St. Joseph, Id. 12,-230; Gilman v. Philadelphia, 3 Wall. (70 U. S.) 725.]

7. The states composed from the Northwestern Territory cannot obstruct their navigable rivers, they being by the ordinance declared to be forever public highways.

[Cited in Huse v. Glover, 15 Fed. 296.]

8. When the old states obstructed their own navigable rivers by laws, the persons acting under those laws are not punishable in the state courts for such acts, unless the acts are contrary to some clause in the constitution, or a treaty, or an act of congress. Then they are, and also in the courts of the United States, if some act of congress make it a crime, and gives power to this court to punish it.

9. When an individual suffers special damage by such an obstruction, he may have civil redress by a suit, though the obstruction be authorized by a state, if it is contrary to, or conflicts with some clause in the act of congress, such as a coasting license. The admiralty law as to crimes at no period has yet been adopted en masse by the constitution, or any act of congress; and the adoption of it as to civil cases, without defining at what period, and in what place, and with what restrictions, has proved embarrassing to the courts. By the admiralty law as to crimes, such an offence as the one charged in this indictment could not be punished in the courts of admiralty in England, since 15 Rich. II.; nor is it known that it could be in the vice admiralty courts in the British colonies. It is doubtful whether any misdemeanors, as this is, were punishable in the admiralty courts at all since 28 Hen. VIII., but merely felonies. Certainly no offences, committed like the acts in this case, within the body of a county, and not on the high seas, and not in great ships in great rivers below the bridges, would be punished in an admiralty court.

[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 422.]

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

10. The only mode of punishing acts, as crimes, which obstruct the navigation of rivers and ports within the limits of a state, and are not now crimes under the laws of a state, or the United States, is by further legislation by congress, under its authority to regulate foreign commerce, and that between the states, declaring what obstructions shall be penal, if not removed or modified, and in what court the offence shall be tried.

This was an indictment, found by the grand jury at the last term, and to which the respondents pleaded not guilty. The indictment alleged, that there was a river in the state of Massachusetts, called the "Acushnet," which was navigable, and in which the sea ebbed and flowed with its tides, running by and forming the port of New Bedford, a port of entry on the one side, and the port of Fairhaven, a town lying on the opposite and eastern side thereof. That the citizens of this district and of the United States were accustomed to pass and repass on the waters of said river and ports, and that the respondents being a bridge corporation, under the direction of William Roach, Jr., and others, have, by force and arms, raised an embankment in the channel of said river on its bed, and erected a bridge across the river eight hundred yards in length and one hundred feet in width, and, from A. D. 1820, till the finding of the indictment, have kept up the bridge, so that navigators and citizens cannot pass to and from the sea into New Bedford and Fairhaven as they before did and of right ought to do, thus injuring the coasting and foreign trade of other nations in alliance with this country, as well as our own citizens. There were two other counts substantially like the first, except containing averments, that sand, rocks and wood were placed in the channel of said river, at points within the admiralty jurisdiction of the courts of the United States; and that the import and export trade were injured by these obstructions, the channel made more shallow, and the danger of navigation increased; and that the directors of the bridge ought to remove these obstructions, but neglected it, to the injury of out citizens and the public, and against the laws and statutes in such case provided. When the trial of this indictment came on, and after the case had been opened to the jury on the part of the United States, the following motion was submitted for the respondents: "And now the said defendants come and move the court here that the said indictment be quashed, for that congress has not declared the act charged in the indictment to be an offence against the United States, and so this court hath not jurisdiction to try the same, or render judgment therefor."

Ch. L. Woodbury and R. Rantoul, Dist. Atty., for the United States.

B. R. Curtis, R. Choate, and J. H. W. Page, for respondents.

WOODBURY, Circuit Justice. This motion has been argued on both sides with a fullness and ability suited to the importance of some of the questions involved in it. I have taken time to examine those questions, and shall now proceed to dispose of them with as much brevity as is consistent with their difficulty and number, and the wide interests connected with them. They include national and constitutional considerations of great moment, and a decision on them involves results which affect practically most of the states in the Union. Most of them have authorized bridges to be built over navigable waters, and several of them have done it within the ebb and flow of the tides of the sea, and at, if not below the limits of some ports of entry as well as of delivery, and to the obstruction in some degree and generally to the delay of all navigation above them. Their power to do this in the progress of internal improvements and of turnpikes, canals and rail-roads, with a view to advance internal commerce and travel, is to be considered, on the one hand, as well as the authority of the general government on the other hand, to check, prevent or suppress such works, whether bridges, or aqueducts, or viaducts, whenever injurious to that foreign commerce of the country which is placed under its regulation, and whenever impeding the navigation between the states as well as foreign navigation, and whenever conflicting with the full use of the ports of entry or delivery within the United States by other nations in friendly alliance with us.

In considering the jurisdiction of this court to punish the respondents for doing what is alleged against them in this indictment, and which is the sole question presented by the motion now under consideration, it may be proper to notice in the outset, that the acts done by the defendants are justified under authority from the state of Massachusetts as early as 1795, and have thus been allowed not merely for the private gain of the stockholders, but for facility to public travel, and the internal trade and intercourse of that portion of the state and Union. The acts of the respondents, then, are not wanton acts of wrong, nor conduct undertaken merely for the purpose of private emolument. They are virtually the acts of the state. The respondents, in substance, justify under the state; and the merits of the case are the same as if the parties were the United States against the state of Massachusetts herself. Consequently the respondents are not to be punished by this or any other proceeding, unless their acts were authorized originally by the state without constitutional power; or unless their acts now come in collision with some subsequent and lawful legislation by congress; or unless, in the lapse of time, what was done at first, without affecting injuriously public navigation, has caused accumulations of sand and a shoalness in the channel, so as to obstruct passing and repassing with

vessels; or, unless, by the increased size of vessels and steam-boats the draw of the bridge has become too narrow for them to go through, or the large additions to their number prevent them from being accommodated within more restricted limits, and in passing through a single draw. Such being the grounds on which alone the respondents could be convicted, the general inquiry is, if this court possesses authority to sustain an indictment against them for the acts done.

The motion in excepting to the jurisdiction of this court to try a case like the present, specifies, as the ground of it, the omission or refusal by congress to have such acts as are charged in the indictment declared to be an offence against the United States. And if for that or any other reason, it should appear to this court a question of real doubt whether it possesses any jurisdiction in such a case over the subject-matter, it will be its duty not to proceed further in the trial (Maisonnaire v. Keating [Case No. 8.978]); because, being a court of limited jurisdiction, it cannot transcend those limits, though the parties make no objection, but is bound, itself, to pause ([Capron v. Van Noorden] 2 Cranch [6 U. S.] 126; [State of Rhode Island v. State of Massachusetts] 12 Pet. [37 U. S.] 719; Kemp v. Kennedy [Case No. 7,686]); and in any stage of the case (Kitchen v. Strawbridge [Id. 7.854]; Davison v. Champlin, 7 Conn. 244; Perkins v. Perkins, 7 Conn. 559); whereas in England, their higher courts have general jurisdiction, and proceed till it is excepted to; and the presumptions are not as here, that a case is without their jurisdiction, till the affirmative is clearly shown ([Turner v. Bank of North America] 4 Dall. [4 U. S.] 11, Ellsworth, C. J.; [Kemp v. Kennedy] 5 Cranch [9 U. S.] 185).

In the courts of the United States, jurisdiction must be derived from the constitution itself, or treaties, or acts of congress, and the question here relates first to jurisdiction by the United States over the subject-matter, as a crime, in the place of this transaction; and next, whether that jurisdiction is vested in this court, if it exists over the subject. Though the motion speaks only of no act of congress giving us jurisdiction, yet the argument in its favor proceeds on the ground, that in order to give to this court jurisdiction, there must be some clause in the constitution, or a treaty, or an act of congress, making proceedings like those by the respondents an offence, and conferring on this court the trial and punishment of it, and that there is no clause of that kind in either. While, on the other hand, on the part of the government, doubting whether any such special legislation is necessary, it is contended, that the constitution and treaties, as well as several acts of congress, make such conduct as that of the respondents illegal, and devolve the punishment of it upon this court. The conduct of the defendants being permitted by the state, as described in this indictment, can hardly be deemed a crime on its face. All sovereignties, bordering on the seashore, have a right to exercise jurisdiction over the waters adjoining. Vatt. Law Nat. bk. 1, c. 231; Bevans's Case, 3 Wheat. [16 U. S.] 337; Pollard's Lessee v. Hagan, 3 How. [44 U. S.] 212; Just. Inst. bk. 2, tit. 1, § 294. This usually does not extend outside of capes and ports, and beyond low water on the open coasts, except as hereafter explained, for revenue, fishing, &c., and as to foreigners, sometimes a cannon shot from shore. Vatt. Law Nat. bk. 1, c. 23, §§ 281–295. It has been settled, however, in Massachusetts, that power over those waters or obstructions in them by bridges, can be authorized by the state, but cannot be authorized by commissioners of roads, or any power short of the state itself, through legislation. Vatt. Law Nat. 43, bk. 1. c. 9; 12 Pick. 467; 4 Pick. 460; 2 Mass. 492; Inhabitants of Arundel v. McCulloch, 10 Mass. 70; 2 Pick. 344; 5 Pick. 199; Com. v. Inhabitants of Charlestown, 1 Pick. 180; Ang. Tide Waters, 45, 46, 128; 15 Wend. 113; Mayor, etc., of Georgetown v. Alexandria Canal Co., 12 Pet. [37 U. S.] 91; State v. Town of Hampton, 2 N. H. 22. Where a stream, as here, is within the limits of a state in its whole course, I see no reason, as a general principle, why that state might not obstruct its navigation, or suspend it. In Rex v. Montague, 4 Barn. & C. 598, it was held, that a right to navigate in a river or creek might be taken away by act of parliament, or by the commissioners of sewers, or by natural causes, e. g. filling up or the recess of the sea. Vooght v. Winch, 2 Barn. & Ald. 670. If a road exists there now, courts may presume that the right to navigate was extinguished before, if no proof is given where or how it was done. Before the federal constitution existed, it is, therefore, not to be doubted, that each state, as sovereign, could govern, within its own limits, roads, ferries, bridges, regulations of quarantine and health, ports of entry, navigation and commerce, internal and external. When forming that constitution, they conferred the power to regulate commerce with foreign nations and between states, and to collect revenue from imports, on the general government, retaining still the powers over the other matters as before, and not to be restricted in them unless their exercise should in some case conflict with the due exercise of the paramount powers granted to congress. [U. S. v. Bevans] 3 Wheat. [16 U. S.] 387; 14 Pet. [39 U. S.] 617 App The states, then, can of course continue forever to regulate and punish what they have not delegated to the general government. [Chisholm v. Georgia] 2 Dall. [2 U. S.] 432–435; [Ex parte Bollman] 4 Cranch [8 U. S.] 75; [Ex parte Watkins] 3 Pet. [28 U. S.] 201; [Kendall v. U. S.] 12 Pet. [37 U. S.] 524; Pollard's Lessee v. Hagan, 3 How. [44 U. S.] 212. Besides this, they can continue, probably, to do the same as to what they have delegated, but not exclusively, (and

where they are not expressly forbidden to act,) until congress legislate in respect to it, in such a manner as to supersede their action. But of this last proposition more hereafter.

Under these views of the relations between the states and the general government, since the constitution was formed, it has been held, that navigable rivers themselves for some purposes and the soil under them, as well as the tide-waters within the capes and counties, still belong to the states where they are situated. [U. S. v. Bevans] 3 Wheat. [16 U. S.] 383; [Martin v. Waddell] 16 Pet. [41 U. S.] 410; [Pollard v. Hagan] 3 How. [44 U. S.] 212. So all other rights over her waters, not ceded for navigation merely remain in a state; e. g. as to fisheries; and hence she can continue to regulate them in subordination to the other. Ang. Tide Waters, 105; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 383. Regulations of rights of property in lands and fishing on the coasts of a state, are not regulations of commerce, and do not conflict with the constitution or any act of congress. Corfield v. Coryell [Case No. 3,-230].

States may regulate ferries, roads. inspections, &c., without violating the grant over commerce to congress, (though in some degree and indirectly affecting commerce,) if it does not come in clear and direct conflict with some legislation by congress. Corfield v. Coryell [supra]; [Wilson v. Blackbird Creek Marsh Co.] 2 Pet. [27 U. S.] 245. But the jus privatum in the state must be so exercised as not to impair or obstruct the higher jus publicum in the United States and the people at large. Corfield v. Coryell [supra]; [Pollard v. Hagan] 3 How. [44 U. S.] 230; 1 Story, Const. 432; Peirce v. New Hampshire, 5 How. [46 U. S.] 504; 15 Wend. 113. And it was laid down generally, in U. S. v. Bevans, 3 Wheat. [16 U. S.] 337, 389, that admiralty and maritime jurisdiction, ceded to the general government, did not pass the waters where that jurisdiction exists, or any territory, and hence, no general jurisdiction over them, but only over that specific matter of admiralty jurisdiction, the rest remaining in the state contiguous. A bay or haven, however, must be out of the jurisdiction of a state, to make an offence punishable there under many of the acts of congress, as congress has not, if it can, extended powers over waters in a state always concurrent with the state, and made offences there punishable. If congress can punish them under any ceded power, it has not yet. I think it may punish obstructions or nuisances, if necessary to regulate foreign commerce, preserve buoys and break-waters, or collect revenue, but perhaps only what is necessary to enforce that grant and others as to maintaining a navy, &c. [Pollard v. Hagan] 3 How. [44 U. S.] 230.

A state retains the powers before named, because not granted away, and the exercise of them by congress is invalid, because not granted to it, on the same ground that its exercise of others is valid only because they are granted to it. Hence, on the subject of roads, a state thus sovereign and unlimited in its own constitution, could, as to its own citizens and powers, pass a law to stop up any of its public roads or navigable rivers, or to erect bridges and viaducts over them without draws or with insufficient draws. [Pollard v. Hagan] 3 How. [44 U. S.] 212, 229; [Martin v. Waddell] 16 Pet. [41 U. S.] 410. It would rest in its discretion, to make the interests of those concerned immediately in the coasting and foreign trade, to yield to those engaged in interior commerce. So on the subject of floating logs on those rivers, it is a local species of business if it be concerned, and may be regulated by a state, and clearly so, till congress act on it differently. Scott v. Willson, 3 N. H. 321. It has been customary, therefore, for all the seaboard states to authorize bridges across navigable streams, under certain limitations, connected with common highways, turnpikes and railroads. In Massachusetts alone there have been since Charles river bridge, in 1785, fourteen or fifteen special licenses and acts of incorporation of that kind. See 1 Sp. Laws, p. 93, and onward; Sp. Laws, vols. 2–7. This, without objection till now, is strong evidence of the right. Briscoe v. Bank of Kentucky, 11 Pet. [36 U. S.] 257, 318. The legislature has always been in the habit of thus promoting its domestic or internal commerce and convenience in traveling, when of an opinion that its people would gain more by the bridge than the navigation under it without the bridge. 1 Pick. 180. But not forgetting navigation, they seldom if ever allow such an obstruction without a draw of sufficient width to accommodate navigation and ship-building, and vessels wishing to pass through. Incorporations of bridges in such places have frequently been recognized by state judiciaries, as suitable exercises of power by states. 17 Conn. 64; 8 Cow. 146; 1 Pick. 180; 7 N. H. 35. In the states within what was governed by the ordinance for the Northwestern Territory, perhaps, this could not be done, as that ordinance declares that all navigable rivers within it shall continue to be "common highways." 3 Ohio, 496; Spooner v. McConnell [Case No. 13,245]; [Pollard v. Hagan] 3 How. [44 U. S.] 224. But I speak of states without any such restriction, or any in their own constitutions, or in the assent to their admission given into the Union by congress. Pollard v. Hagan, 3 How. [44 U. S.] 212. Or where no treaty by the general government, like that of 1783 and 1794, stipulated for the free navigation of a river like that one of the Mississippi. "The navigation of the river Mississippi from its source to the ocean shall forever remain free and open to the subjects of Great Britain and the citizens of the United States." Article 8 of treaty of Sept. 3, 1783 (8 Stat. 83). "The river Mississippi shall, however, according

to the treaty of peace, be entirely open to both parties." Article 3 of treaty of 1794 (8 Stat. 117).

It is yet unsettled, whether if a river navigable above one state, then runs into another before it joins the ocean, the lower state may not obstruct it or exact tolls. This point was not started, nor decided, though it would arise in [Mayor, etc., of Georgetown v. Alexandria Canal Co.] 12 Pet. [37 U. S.] 97, nor need it be settled here, as all this stream is in one state. The free navigation of the Mississippi or of the Florida rivers, however, was never yielded to us, while Spain, a foreign state, owned the territory at their outlets. Nor is that of the St. Lawrence or of the St. Johns owned by the British, yielded except by treaty and for a quid pro quo. The arguments in favor of their freedom in such cases, though plausible, have never yet been admitted as rendering the question a settled one in national law in their favor. 1 Am. St. Papers, "Foreign Relations." 252, 253, 260; 3 Am. St. Papers, 341; Jour. of Old Cong. 1787; 1 Lyman, Dip. of U. S. 239, 267; 2 For. Rel. 101. Even the Sound duties in the Baltic for passing through an arm of the sea, are acquiesced in by most nations, though it is rather to defray the expense of keeping it lighted, as light-money is paid on other coasts, and to remove and replace buoys yearly, as the ice forms and disappears, and keep the passage free from piracies, than any departure from the general principle that the sea is free to all, however rivers may be. as the sea is the great highway of nations rather than of one nation; and the outlet usually is not enclosed by the territory of any one government. The case of the Black Sea may be an exception, at the Straits, as there that is preserved a close sea by Turkey, and its passage obstructed and regulated as if a navigable river, entirely within her territory, though resisted, and at times, successfully, by other nations. See on these. Vatt. Law Nat. bk. 1, c. 23, §§ 281–295. But that not being this case. nor this being an obstruction by an individual, without a claim of authority from the state, I feel compelled to admit that the state itself may set up her state rights to legislate concerning the waters where this bridge exists clearly within her limits, and partially obstruct them, if she thinks it beneficial, till her acts conflict with some law of congress connected with foreign commerce, or that between the states. Kellogg v. Union Co., 12 Conn. 7.

But while conceding such rights to states over their navigable waters, I think that corresponding duties are imposed on them to treat wanton or careless obstructions in them by individuals, as offences, and to punish or remove them as nuisances. This is the doctrine of both the common and the civil law. Spooner v. McConnell [supra]; Mayor, etc., of Georgetown v. Alexandria Canal Co., 12 Pet. [37 U. S.] 91; Bac. Abr. "Nuisance," B.; 2 Ld. Raym. 1163; 10 Mass. 70; Coop. Just.

68. and note, 455; Ang. Tide Waters, 15, 16; Vatt. Law Nat. bk. 1, c. 22; 20 Johns. 98; 17 Johns. 195; 3 Caines. 319; 2 Conn. 481. The passing upon such rivers belongs to the public or people at large, as public highways, and can be obstructed only by acts of parliament in England, or the states here; or, perhaps, in some cases by congress, when under the execution of some of its special powers. Martin v. Waddell, 16 Pet. [41 U. S.] 367, 410; Hale, De Jure Maris, 11; Com. v. Ruggles, 10 Mass. 391. Thus in England, while the king owns the soil between high and low water, the sea and navigable waters are open to be used in common by the people, whether for navigation or fishing, unless the former is stopped by the sovereign power before named, or the fishing is in fresh water owned by an individual on both sides. There is a jus privatum and a jus publicum. Ang. Tide Waters, 16, 19, 109; 5 Com. Dig. 102; 10 Coke, 141; 1 Salk. 357; 1 Mod. 105; Rex v. Smith, 2 Doug. 441; 5 Coke, 107. And if fishing, as one public right, should conflict with navigation, another, the former, as of minor importance, must yield, and the parties take in their seines. Ang. Tide Waters, 32, 95; Post v. Munn, 1 South. [4 N. J. Law] 61. In Massachusetts, the province or colony so changed the common law principle on this subject, that the soil on the sea-shores belonged to the contiguous owners rather than the king, (or the province, and afterwards the state,) for one hundred rods, when the tide ebbed out so far. 1 Pick. 180; 6 Mass. 153, 435. And, by some usage or common law, it has been held, that the owner may build houses or wharves on the flats one hundred rods, and thus obstruct the navigation there, but leaving it open beyond. Ang. Tide Waters, 154, 155; Austin v. Carter, 1 Mass. 231; Adams v. Frothingham, 3 Mass. 352. It is otherwise, if not left open beyond. Ang. Tide Waters, 157; 2 Davies' Abr. 697. But in Respublica v. Caldwell, 1 Dall. [1 U. S.] 150, it is held, that one cannot build a wharf encroaching on navigable water, though room enough beyond is left for navigation. So in England, semb. 2 Starkie. 511, 3 Serg. & Lowb. 453. Generally, however, whether the soil under the tide, and under navigable rivers is owned by individuals or the states, it is, till changed by special legislation, subject to the public easement of passing over it as a water highway. Ang. Tide Waters. 53, 109; Adams v. Frothingham, 3 Mass. 352. Such right was expressly reserved in the Massachusetts charter (pages 1, 148). And if an individual owns the soil on both sides of a navigable river or arm of the sea, he cannot erect a bridge across, so as to impede or injure the jus publicum for navigation. Com. v. Inhabitants of Charlestown, 1 Pick. 180. If done by an individual, or any persons without authority from the state, such obstacles to navigation are and should be punishable, and usually are under the local government.

Without going into discriminations as to different kinds of obstruction and the different modes of redress, whether the former be by bridges, or ballast, or sunken ships, or the latter by a suit for damages, or an injunction or indictment, information or abatement as of a nuisance, it is sufficient here to refer to the following cases. Russ. Crimes, 485; 1 Cowp. 86; Ang. Tide Waters, 29, 31, 45, 101; 10 Mass. 70; Harg. Tr. 36. See appropriations by congress to remove obstructions in the Mississippi and other rivers, and in harbors, as in New Bedford, and especially sunken ships near Savannah and Baltimore; and 5 Coke, 101; 2 Salk. 459; 3 Bl. Comm. 5; Nabob of The Carnatic v. East India Co., 1 Ves., Jr., 371; 5 Barn. & Ald. 268, and cases cited, post: Malynes' Lex Mercat. See cases before cited. 6 Barn. & C. 566; Leach, Crown Law, 388; 2 Leach, 1093; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 366, note; [Wilson v. Blackbird Creek Marsh Co.] 2 Pet. [27 U. S.] 245; East, P. C. 773; Bac. Abr. "Injunction B."; Rose v. Groves, 5 Man. & G. 613; 1 Esp. 148; Cro. Eliz. 664; 2 Bing. N. C. 281; Willes, 74; 4 Maule & S. 101; 2 Scott, 446. So in England, a grant of land covered by the sea, does not justify the grantee in putting up obstructions to the free navigation. 10 Price, 350, 378. See post, Ang. Tide Waters, 141, 150; 8 Brow. T. R. 18. The public rights to navigate, &c., go to ordinary high water (Ang. Tide Watters, 67; 2 Johns. 337; Com. v. Inhabitants of Charlestown, 1 Pick. 180); while private rights begin at the same place (Id.). From all this it is manifest, that the place where this bridge is situated and the subject-matter of it, and of nuisances in the river there, are within the scope of state authority to punish or permit, till congress legislate for some of the objects within its sphere, in such a way as to come in collision with the action of the state.

If it be asked, then, whether the state laws make these acts a crime, it may be answered from what has been stated, that but for their special legislation, allowing this bridge, those acts doubtless would be a nuisance, and punishable as a crime in the state courts as at common law. But an obstruction of a public highway within the limits of the state, by its own permission, probably could not be punished as a crime there, if the act of incorporation by the state permitting it be constitutional. 15 Wend. 114; [Wilson v. Blackbird Creek Marsh Co.] 2 Pet. [27 U. S.] 245; Dover v. Portsmouth Bridge, 17 N. H. (Strafford county, 1846) 200. It would be difficult to regard that as an offence against state laws which has been done in conformity to them, under an act of incorporation from them. She is, perhaps, the best judge on all local matters, all sections and interests being represented in her public councils; and at least if she, for public considerations, authorizes a bridge under certain restrictions and limitations, which she deems safe, it would be an anomaly for her herself to consider its erection a crime. If she authorizes it injudiciously, and injures navigation to her ports more than she benefits interior travel and trade, she is the chief sufferer.

Such being the condition of state powers, state rights and state laws on this subject, without reference to the constitution of the United States, the next inquiry is, how have these been affected by that constitution, either by prohibitions to the states, or by the grants to the general government before referred to, and the legislation which has taken place under them? After the federal constitution was adopted, if a law by a state on this subject violated any prohibitory clause in it, or any act of congress, duly enforcing any grant of power from the states, it would of course be unconstitutional; but whether it would then be a crime, under the federal government, and punishable by indictment in this court, as legislation now stands, depends on still other considerations, which will soon be examined. Before deciding what part, if any, of the constitution, the acts done by the respondents violated in any degree, we must ascertain what authority in respect to such subjects the states parted with. The powers not granted by the states remained as before; that is, they were reserved to the states or the people, as either may have exercised them before. Thus in Miln v. New York, 11 Pet. [36 U. S.] 102, 139, it is held, that the powers reserved to the states are usually unaffected by the federal constitution. Again, the states may continue to legislate for internal commerce, for police, for roads, ferries, canals, &c., and regulate all, and "the use of them, where such regulations do not interfere with the free navigation of the waters of the state for purposes of commercial intercourse, nor with the trade within the state, which the laws of the United States permit to be carried on." Corfield v. Coryell [Case No. 3,230]. Three kinds of commerce are confided to the general government,—foreign, between the states, and with the Indians. Hence, congress possesses the power to regulate them, over those navigable waters, and to punish offences in public vessels sailing upon those waters. [Pollard v. Hagan] 3 How. [44 U. S.] 230; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 387. In this instance, it is contended, that the doings by and under the state interfere with and obstruct foreign commerce and that between the states. But this is not done eo nomine, nor was such the avowed design; for Massachusetts was regulating domestic or internal commerce, and hence acting on a subject not granted at all to congress, but among those reserved. Brown v. Maryland, 12 Wheat. [25 U. S.] 419, 452 (Thompson, J.); Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, 194 And the only ground of complaint in such a case is, that

the state has so exercised her power over that reserved subject as to impair the rights of the public and the general government. as to foreign commerce or that between the states. Do the acts, authorized to be done by Massachusetts, violate then any thing delegated to the general government over foreign commerce, or that between the states? And if so. is such a violation made a crime by the general government, and the trial of it devolved on this court?

In order to consider a state law as void, because conflicting with one of the United States, it must not only affect the subject-matter, have some influence over it, but be directly incompatible or repugnant,—an extreme inconvenience to it. 1 Story, Const. 432. Then must interpose, but not till then, the supremacy of the laws of the general government within its proper sphere, prevailing over those of the states, when so using their own as to encroach on others. If "clashing sovereignties" come before us —if one claims a right to set up what the other claims a right to pull down, or one to use powers of taxation so as to abuse them, and violate what is confided to the general government—then we must decide which is right. and if the general government is, then its laws must be paramount, and prevail. Holding the laws of the state to be subordinate when in conflict, is not giving to the United States any odious supremacy; but merely saying. that when the states have parted with certain powers to congress, they shall not so continue to exercise what are reserved as to impair the grant and use of those they have, for paramount public objects, confided elsewhere. Verba fortius accipiuntur contra proferentem. The exercise of reserved powers by the state, when conflicting with legitimate acts of congress. must yield, if so used as to be repugnant, as must the exercise of concurrent powers by the states, when becoming repugnant. Otherwise the general government could not move on, and its constitution and laws be paramount even within their proper sphere. [City of New York v. Miln] 11 Pet. [36 U. S.] 103, 137, 147, 156; Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, 195. 209; [Brown v. State of Maryland] 12 Wheat. [25 U. S.] 419. 446; 6 Pet. [31 U. S.] 515; Com. v. Kimball, 24 Pick. 359, 365; U. S. v. Hart [Case No. 15,316]; Holmes v. Jennison, 14 Pet. [39 U. S.] 540, 574. This is necessary by the constitution itself (article 6). "This constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made. under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." So clearly was it supposed when the constitution was adopted, that the acts of congress under it would prevail over conflicting state laws, that the only objection was, they would ride over the state constitutions also. But Mr. Madison, in the 44th number of the Federalist, shows clearly that they must prevail over state constitutions, also, when conflicting; or there would be no uniformity of laws in operation, over all the Union, but some would be nullified in one state by its constitution, but be in full force in others.

In Corfield v. Coryell [Case No. 3,230], in speaking of the power to regulate commerce invested in the general government, the judge says it "comprehends the use of a passage over the navigable waters of the several states," and further, it "renders these waters the public property of the United States for all the purposes of navigation and commercial intercourse, subject only to congressional regulation." Hence, I cannot doubt that the power to regulate commerce abroad and between the states, conferred on congress, authorizes it to keep open and free all navigable streams, from the ocean to the highest ports of delivery or entry, if no higher, and protect the intercourse between two or more states, on all our tide waters. De Lovio v. Boit [Id. 3,-776]; [Pollard v. Hagan] 3 How. [44 U. S.] 230; Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; New York v Miln, 11 Pet. [36 U. S.] 102, 135; Ang. Tide Waters, 50. Congress may remove unauthorized obstructions, or punish them by acts of congress, and it may punish injuries on land, if they tend to interfere with foreign commerce and navigation, or those between different states, though mere admiralty powers may not go above the sea. U. S. v. Coombs, 12 Pet. [37 U. S.] 72. See in detail, Miln v. New York, 11 Pet. [36 U. S.] 102, 155, by Justice Story.

In the recent case of Waring v. Clarke, 5 How. [46 U. S.] 441, it has been settled, that jurisdiction in admiralty exists over torts, by collision of vessels, committed above the sea or tide water, however far it flows into the body of a county. But this is not the English law; and it is to be hoped will never be extended in this country to crimes, the subject we are now considering. The powers of congress, however, embrace much wider matters than those of mere admiralty on account of its authority over our foreign relations, and the regulation of our commerce, not only with foreign nations, but between the states. And, as one evidence, that the framers of the constitution meant that the latter should cover matters on land often. as well as at sea, power was given to congress, not only "to define and punish felonies committed on the high seas," but "offences against the law of nations." These last happen as often on land as water; as do offences against the revenue. and the purity of our coin and the security of the mails, and of all public property. Mere admiralty au-

thority is much more restricted. By that, also, as well as by the authority to regulate commerce, no soil may pass. The right to the soil is one thing, the right to navigation in the water over it another, and is vested elsewhere, for some purposes, in our government, as well as in other governments.

It seems, that now in England, where a grant is made to a town or city of lands between high and low water mark, it is not to be construed as giving a right to obstruct free navigation, carried on by any, or all people under general rights of trade, such as are enjoyed under our federal government. And where obstructed, a bill may be filed in the exchequer by the attorney general, to restrain and abate the obstruction as a nuisance. Attorney General v. Burridge, 10 Price, 350; Attorney General v. Parmeter, Id. 378. If towns here claim jurisdiction over waters navigable below low water, they have no right to the water, nor any to the soil below high water. Palmer v. Hicks, 6 Johns. 133. For purposes of foreign commerce, and of that from state to state, the navigable rivers of the whole country seem to me to be within the jurisdiction of the general government, with all the powers over them for such purposes (whenever they choose to exercise them), which existed previously in the states, or now exist with parliament in England. So by the civil law, "navigable rivers," "the sea and its shores," are destined to common use (1 Domat, lib. 8, § 1, art. 1), and the common use here for conveyance is with the Union. They are a species of highway, and, therefore, cannot be appropriated to private use, except temporarily, either by individuals or corporations. New Orleans v. U. S., 10 Pet. [35 U. S.] 662, 724, 729. Certainly not, in a permanent manner, unless authorized by the paramount government, which supervises and controls them as highways. There is a very instructive case on this subject in 10 Price. 350 (Attorney General v. Burridge), which seems to have escaped the research of the counsel. It was an information by bill, praying that the defendants might be restrained from obstructing Portsmouth harbor, "so that the sea may again flow and reflow over the piece or parcel of ground mentioned in the bill." The obstruction was by buildings on piles over navigable portions of the harbor, and it was justified under a grant of the soil from the king. It seemed to be conceded, that the king may own the shore between high and low water, and grant any private interest in it. See pages 369 and 401. Such is the doctrine as to the states. [U. S. v. Bevans] 3 Wheat. [16 U. S.] 383. But it was, also, held, that the people, or, in other words, the public, have a right to the navigation, and an interest in all ports. 10 Price, 372. Hale, De Portibus Maris, pt. 2, c. 7. The king or his grantees have the soil, jus privatum, but subjects generally and alien friends, have a right to navigate the water,

a jus publicum; and hence, if the buildings are a nuisance, they can abate them (10 Price. 373. 378), as if on a public highway (2 Anstr. 603). Individuals must use their own so as not to injure others. 10 Price, 378. Sic utere tuo ut non alienum lædas. What does encroach on or straiten the harbor, or lessen the depth of water and navigation, is a fact, questio facti. Id. 374. But when done, it is an offence against the power which supervises the general commerce of the country. Hale, De Portibus Maris, 35, 84. See, also, next case, Attorney General v. Parmeter, 10 Price, 378, 412; Attorney General v. Richards, 2 Anstr. 603, 608. But though congress is enabled to make laws, keeping navigable rivers and navigation unobstructed, as high up at least as the ports of entry and delivery, if not as high up as the waters are navigable, and impose punishments for such obstructions as crimes, yet if it has not been so done. can we punish it as a crime? If we cannot, this stands in the threshold against sustaining the present indictment in a court of the United States, and the act of incorporation by the state, allowing the bridge to be built, stands in the way of punishing the obstruction by it as a crime in the state courts.

Some hold, that a grant being made to congress to regulate foreign commerce, and extend its judicial power to all cases in admiralty, and collect a revenue from imports, and maintain a navy, those grants alone, without any action on them, by the general government, as to bridges and other obstructions, divest the states of all authority to make laws in connection with navigable waters, and that hence such an act of incorporation as exists in this case is unconstitutional and void, and is to be put out of the case as if not existing. While others contend, that as the states have not granted the power to congress over their internal commerce, that remains exclusively in the states, and that under this, they may erect bridges connected with that internal commerce, without being amenable to any supervision or check by the general government; and certainly not, unless the legislation conflicts in point of fact with some which has actually taken place under congress. My own views do not accord exactly with either of these general positions. I think (1) that the power is, by the grants above referred to, vested in congress over navigable waters connected with our foreign and coasting trade, and for purposes of revenue, but does not by those grants prevent the states from continuing their former legislation over them, and especially as to reserved objects, till it conflicts with some laws passed by congress under those grants, or some treaties made, or some express provisions of the constitution. [Holmes v. Jennison] 14 Pet. [39 U. S.] 594. And (2) that when the states exercise the powers reserved, as to their internal commerce and police, they may do it with im-

punity, while not in conflict with any thing before done on the part of the general government. But when in conflict, the express grant to congress, and the action on it properly by the paramount government, must overrule and control all which is done repugnant to it by the state. 12 Conn. 7.

If it was necessary to admit that the state here, as contended by the prosecution, was exercising a power to regulate that foreign commerce, such as is confided to the general government in the constitution, its conduct was perhaps still valid, till it conflicted with some act passed by congress, or some duty or right under its federal relations. [City of New York v. Miln] 11 Pet. [36 U. S.] 103; [U. S. v. The Arnistad] 15 Pet. [40 U. S.] 574. But it would hardly be necessary in this case to go into that, if all admitted that a state might do this act of empowering a bridge to be erected here, under its reserved rights as to internal commerce. For then of course it would be valid, till conflicting with some paramount act of congress under its conceded authority to regulate foreign commerce and that between the states. [Wilson v. Blackbird Creek Marsh Co.] 2 Pet. [27 U. S.] 245. Yet this, as before remarked, being contested, and it being considered by some vital against the constitutionality of the state laws, if affecting a matter of foreign commerce, or that between the states, though not conflicting with any act yet passed by congress, I shall make a few remarks on it here, and refer to others made by me in Peirce v. New Hampshire, 5 How. [46 U. S.] 554, 618.

I think it the safer and sounder opinion, that a mere naked power, unexercised and dormant in the general government, with no prohibition, express or implied, to the states, to act on the same matter, could not make the state legislation upon it nugatory or unconstitutional, much less render acts crimes, which are done under state laws of that description. Wilson v. Blackbird Creek Marsh Co., 2 Pet. [27 U. S.] 245. Such are laws as to weights and measures. Besides these, as to disciplining the militia, and on bankruptcy, and regulating the army. Groves v. Slaughter, 15 Pet. [40 U. S.] 449. The subject under consideration now, as to roads and bridges, was, however, never of that mere doubtful character, but was among the powers supposed to be reserved to the states, where it before belonged. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 203. It was always to continue to be exercised by them for domestic or interior commerce within each state, that branch of commerce not having been granted at all to the general government. And, as hereafter explained, it could never be questioned in its exercise till it impaired or encroached on some power over foreign commerce, or that between the states, which had been confided to all the states united. If the states can and will, till special legislation by congress, punish such acts as they deem injurious to the public interests, and do it either under their reserved or concurrent powers, no necessity exists for any forced construction to enable this court to act, in order to prevent such wrongs from going unprosecuted. If done under their reserved powers, and able to be vindicated under them, their right is clear. But if done as a concurrent power, and relating to some local matter, connected with foreign commerce, either allowing or punishing it, their right is less clear, but in my view, can be successfully vindicated.

Supposing that I have not succeeded in showing this act of incorporation, and the conduct of the defendants under it to be legal under the reserved powers of the states, it seems to me legal as before intimated, under a concurrent right in the states to legislate on local matters connected with foreign commerce, till coming in actual and serious collision with some measures by congress. My reasons for this opinion are these. The states were the great fountains of legislation, the bulwarks of social and civil rights. Where they had acted before the constitution, they would be likely to continue to provide as to local matters within their own limits, till congress got ready to provide for them, when the power was granted to congress. This would especially be the case as to such pressing and interesting matters as commerce. The constitution, when not expressly forbidding the states to act longer on the matter, nor forbidding it by necessary implication, seems to allow it, and the continuance of some local state cognizance over it is often requisite for the public peace and safety. Hence, it has become the more prevailing doctrine among jurists and statesmen in these cases of powers bestowed on congress, and not expressly, or from the nature of the case, prohibited to the states; that till congress find it expedient to make specific laws under them, the authority of the states must be regarded as still continuing, in order to preserve order and the public tranquility, and to regulate and punish, or license and uphold local measures according to the views of each state, or the interests of the community within its boundaries. Because otherwise, there could be no punishment for some of the most flagrant outrages, and because the makers of the constitution well knew, that congress could not at once and forthwith provide for the full exercise of all its clear powers, if it wished, and would find it expedient not to use some, till time and occasion might develop the necessity of using what had been confided to it, and then would provide for the emergency by further and specific legislation. In the mean time, considering the states as still legally entitled to preserve the public interests and peace within their limits, and punish violations of them, in cases where they did it before, would not be derogatory to the general government, nor strip it of any le-

gitimate authority; it would treat the continued exercise of such powers by the states as only concurrent, or rather subordinate, till the general government found it expedient to legislate, and then of course the concurrent or subordinate authority of the states, yielding to the exercise of the same authority by the general government, which it had been empowered to use, and whose exercise of it, where once commenced, would be paramount.

The following books and cases sustain this course of reasoning: 4 Elliott, Deb. 367; 3 Jeff. Sp. 425–429; Peck, Tr. 401, 434, 435; [Fisher v. Blight] 2 Cranch [6 U. S.] 397; 3 Serg. & R. 179; [Sturges v. Crowninshield] 4 Wheat. [17 U. S.] 196, 198. See others, post, and in Houston v. Moore, 5 Wheat. [18 U. S.] 1, 49; Sturges v. Crowninshield, 4 Wheat. [17 U. S.] 196; Willson v. Blackbird Creek Marsh Co., 2 Pet. [27 U. S.] 245; Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, 627, 655, 664; 9 Johns. 568; Miln v. New York, 11 Pet. [36 U. S.] 103, 132 (by Thompson, J.); [U. S. v. Bevans] 3 Wheat. [16 U. S.] 386; Calder v. Bull, 3 Dall. [3 U. S.] 386; 1 Kent, Comm. 364. This view is not limited to that class of cases, where the states have not granted to the general government any power, though bordering closely on express grants, as in case of fisheries. They still retain the power to regulate these on their rivers and on their coasts as before, and have never parted with the power over them. Corfield v. Coryell [Case No. 3,230]; Martin v. Waddell, 16 Pet. [41 U. S.] 367. So as to quarantine laws, police regulations, ferries, and roads and bridges, the states retain the general power over them all. Miln v. New York, 11 Pet. [36 U. S.] 102, 141, 142, 151. So in respect to pilots, they continue to legislate by the express assent of congress; and it is not, in my view, a truth that the states and the people have not granted power to congress, which may affect ferries, roads, and bridges, in certain cases, by granting authority to the general government to regulate commerce, foreign and between the states, but probably that, till congress act on the subject, the states should continue to act for reasons before stated, and when congress have legislated on a part only, should afterwards continue to act so far as congress have not come in collision with the state laws.

The cases of the militia, and of bankrupt laws, weights and measures, taxation of land, &c., have been before referred to, and are familar cases, where the states have continued for half a century to act, when congress did not conflict with them, though they are powers clearly and expressly granted to the general government, in the same language and article with those as to commerce, but not seeming to be exclusive in their character. And in numerous other instances, since the first years of the operations of the government, the courts of the United States have, for the first time, been specially empowered to try for offences in cases, where previously they possessed no such authority to do it, and where previously even the acts complained of were not offences by any laws in force under the government of the United States. See many cases as to crimes, in the act of March, 1825. It is, at the same time, conceded that the courts of the United States have felt indisposed to decide cases on this ground, when able to dispose of them on other grounds. Hence, in Miln v. New York, 11 Pet. [36 U. S.] 102, the judgment was rendered on the ground, that the state was exercising a reserved right, and so in Groves v. Slaughter, 15 Pet. [40 U. S.] 509; and so a part of the court in Holmes v. Jennison, 14 Pet. [39 U. S.] 540, 580. But Justice Thompson, in the former, held this doctrine, and Chief Justice Taney seemed to do it in the latter, though he said [Groves v. Slaughter, 15 Pet. (40 U. S.) 509] it was not yet decided, nor was it necessary to decide, whether a state law was not good as to foreign commerce, till it conflicted with some act by congress.

In the recent decision in what are called the "License Cases," 5 How. [46 U. S.] 504, some members of the court went into this question, and held, that if the license laws were regulations, affecting our commerce abroad or between the states, they were defensible as local measures, not intended to encroach on the acts of congress, and not in fact impugning any of their provisions to produce uniformity, and regulate generally, the trade of navigation of the country. They were like colonial laws in respect to a parent country, or by-laws of cities, towns, and corporations, as compared with their charters, or rules of the navy and war departments, and of courts under general provisions organizing them. All are permissible, yet all subordinate, and none are void till repugnant and inconsistent. See the License Cases, 5 How. [46 U. S.] 504. Thus, for illustration, congress has made no provision for keeping many of our ports and harbors free from sand-bars and deposits of mud, so as to enable vessels engaged in the foreign or coasting trade to enter and depart under the general regulations of commerce for that purpose; and some have deemed it unconstitutional for congress to expend money on such objects. But cannot the states remove those bars and deposits? States and cities have often done this. Because congress has made the place a port of entry, can the states do nothing in relation to it, under the idea that the power of congress is exclusive? Cannot the states and cities under them, also, appoint harbor masters to regulate ballast, and the place of anchorage of the foreign vessels? Cannot they make or authorize wharves, at which the vessels can unload? or prescribe how their fires shall be extinguished or guarded while in port, so as to prevent conflagration to the shipping and the town?

It is not mere quarantine or health laws, or inspection laws, or police laws, or pauper laws, or bridges and roads, or laws as to internal commerce within the state, all of which may be considered as reserved, and the power over them never granted, but much as to the improvement and regulation of harbors and vessels in port in other respects, the loading and unloading, and various minutiæ, some as to pilotage, and some as to the crews, all connected with the vessels engaged in foreign navigation, as well as others, but not directing any thing in respect to them, which conflicts with any actual existing legislation by congress.

In [Holmes v. Jennison] 14 Pet. [39 U. S.] 579, the chief justice and a majority of the court, held, that unless the power was exclusive in the general government, a state might continue to exercise it, if she had done it before the constitution; and that it was not exclusive, unless expressly forbidden to the states, or in its character, one which should be exercised alone by the general government, and implies an exclusion of the states entirely; e. g. legislation over the District of Columbia (page 589). On such principles if, says Justice Barbour, "they can be construed as being exclusive," "then the necessary consequence is, that the states cannot exercise them, whether the general government shall or shall not think proper to exercise them. If, on the contrary, they are not exclusive, but concurrent, then the states may rightfully exercise them, and no question of repugnancy can ever arise whilst the power remains dormant and unexecuted by the general government." As some powers are expressly prohibited to the states, this raises a presumption that all are, which it was meant should be. And as these local powers in connection with foreign commerce are not expressly forbidden to the states, they were not to be so considered, and have not been in practice for the last half century. The advocates of the exclusiveness of this power in congress, will no more allow the states to act, where congress has not acted, than where it has. They hold, that the power is gone from the states entirely, and that congress by its silence as emphatically speaks, that nothing shall be done, as by its legislation that something shall be. The Chusan [Case No. 2,717]; Golden v. Prince [Id. 5,509]; Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, 618; [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 209; Groves v. Slaughter, 15 Pet. [40 U. S.] 504 (by McLean, J.), 511 (by Baldwin, J.); Miln v. New York, 11 Pet. [36 U. S.] 158 (by Story, J.); [Houston v. Moore], 5 Wheat. [18 U. S.] 1, 21, 22; [Brown v. State of Maryland] 12 Wheat. 438. But how does this tally with the fact that the general government, under the new constitution, went into effect March 3d, 1789? Owens v. Speed, 8 Wheat. [21 U. S.] 420. Most of the important laws as to imposts, ports of entry, and the judiciary, did not pass for some months after. See 1 Laws by Litt. & B. 24,

27, 72. Hence, on this theory it is obvious, that an entire interregnum of law has existed, and must exist in many cases, till congress legislate expressly on matters that have been confided to it.

I am not here going into the powers expressly reserved to, and left with, the states, but those which are granted, though in their nature not granted exclusively in every respect, local or otherwise, and not exercised in hostility, but in allegiance and subordination to the general government. [M'Ilvaine v. Cox] 2 Cranch [6 U. S.] 297; 9 Johns. 507; 3 Serg. & R. 179. A regulation by a state may aid or co-operate with an act of congress, be a friend and not an enemy, and though it is not a police one, yet if within the legislative scope of the action of a sovereign state, it may move on till impinging against something actually prohibited to the states, or actually and legitimately done by congress contrary to it. See case of Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, 657, views of the minority. The idea, that because congress can act on the matter, but have not, all state action, though favorable and assisting the object, is ipso facto void, seems to me entirely untenable. Daniel, J., page 657, and Thompson, J., page 635. And it is equally void in the views of some if the action of the state coincides and aids any exercise of powers by congress, as if conflicting with it. Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 651. All permitted to the general government, is not enjoined to be done, and at once, but only when necessary, useful or required by public exigencies, e. g. to declare war, to borrow money, to lay and collect taxes, as well as to regulate commerce. And when some loans are needed, or some taxes, or some regulations of commerce, it does not follow that all are, or all these powers at once are to be acted on and exhausted; or that the states cannot continue to borrow money, or collect taxes, or pass any local laws concerning commercial matters, when not expressly prohibited, and not conflicting with those by congress for general and uniform purposes. [Turner v Bank of North America] 4 Dall. [4 U. S.] 11; [Bank of U. S. v. Deveaux] 5 Cranch [9 U. S.] 61.

All the powers have never yet been legislated on, which are given to congress in the constitution. [M'Intire v. Wood] 7 Cranch [11 U. S.] 504; Ex parte Cabrera [Case No. 2,278]; Corfield v. Coryell [Id. 3,230]; Livingston v. Van Ingen [Id. 8,420]; [Turner v. Bank of North America] 4 Dall. [4 U. S.] 10; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 387. The constitution has merely empowered congress to regulate certain matters when its members please. But till they please to do it, and in all which congress do not please to touch at any time, the states may usefully continue to regulate the subject within their respective limits, till congress finds it expedient and a duty to act, for the whole. See cases before cited. In one part of the constitution (article 1, § 10) the states are at once and absolutely prohibited

longer to do certain things, and then of course there is no concurrent power; as for instance, "no state shall declare war," "no state shall make any thing but gold and silver a tender," "no state shall emit bills of credit," &c. But in other places, and especially as to the regulation of commerce, it is not so. It is not "no state shall longer regulate commerce," but "congress shall have power" "to regulate commerce, or foreign," &c., and so is the grant. That is, congress shall have power to regulate it whenever and to whatever extent it pleases, but in the mean time till it chooses to regulate it, and in all it leaves unregulated of a local character, the states are not prohibited to do what they before had a right to do. Congress may in terms, also, be at times invested exclusively with a power, or its further exercise by a state may be inconsistent, incompatible, or absurd. Such is the government of the District of Columbia, or of the navy. They stand, of course, like prohibitions, and are governed accordingly. Houston v. Moore, 5 Wheat. [18 U. S.] 49.

It is not a little singular, that amidst so high-toned and broad constructions as Hamilton generally adopted, he still acquiesced in this system of construction concerning the grants of judicial power to the general government, and held them never to oust that of the states before existing, unless clearly contradictory. In No. 82 of the Federalist he says: "But as the plan of the convention aims only at a partial union or consolidation, the state governments would clearly retain all the rights of sovereignty, which they before had, and which were not, by that act, exclusively delegated to congress. This exclusive delegation, or rather this alienation of state sovereignty, would only exist in three cases; where the constitution in express terms granted an exclusive authority to the Union; where it granted, in one instance, an authority to the Union, and in another prohibited the states from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the states would be absolutely and totally contradictory and repugnant." But can it be pretended, that the action by a state on mere local matters of a commercial character, and about which congress has not yet legislated, is contradictory or repugnant? Certainly not, till congress do something concerning this particular matter, and then, as before shown, its laws and regulations must be considered paramount. [Groves v. Slaughter] 15 Pet. [40 U. S.] 509. The chief importance in settling the true construction of grants like these, to be such as not to prevent the state courts and state legislatures from continuing to act till congress legislates, is, that it takes away any apology for forced and broad constructions, and a resort to common and admiralty law analogies and aids, without acts of congress evidently and clearly made in order to punish offences. For without such a dangerous construction and resort, they can be punish-

ed by the states, if the states please. But if they could not be either so punished or allowed, how would the argument stand? An act would merely go unpunished till congress choose to denounce it as a crime, and provide what court should try it. And for this reason can limited courts like this, under a limited government like that of the United States, assume, that because the people and the states have empowered congress to regulate commerce, and define piracies and felonies committed on the high seas, and given to its courts authority over all cases of admiralty and maritime jurisdiction, the offences connected with these matters are sufficiently defined in the constitution itself? Surely not.

The next question to be examined in detail, and with the care its deep interest to the state and the general government deserves, is, whether the conduct described in this indictment, though at a place where the powers of congress may reach for commercial purposes, can be regarded as a crime by this court, unless it has been clearly so declared by the constitution, or a treaty, or an act of congress, and its trial devolved on us? Various decisions have been made, which hold that some act of congress, or at least the constitution or a treaty, must expressly define a crime and grant jurisdiction over it to the circuit court, before the latter can sustain an indictment for any conduct supposed to violate the public rights or public peace. And, in accordance with these, it has been further held, that a matter must be presented to a court of the United States in some authorized form, before it becomes a case under the constitution or laws. Osborn v. Bank of U. S., 9 Wheat. [22 U. S.] 738; [American Ins. Co. v. Canter] 1 Pet. [26 U. S.] 511. The decisions, above referred to, proceed upon the ground, that the general government itself is one of limited powers, and hence possesses no authority to punish conduct, beyond what is expressly granted to it, or is necessary and proper to carry into effect what is expressly granted. That it hence follows, no conduct can be declared a crime by congress, which does not come within such power. That the constitution, being an organic instrument and form of government for general purposes, does not usually establish courts, and limit their jurisdiction, and parcel out among them and define various offences, but leaves that duty to congress. The definition of treason in article 3, § 2, is almost the only exception.

It is furthermore held, that if congress does not declare particular acts to be offences, and prescribe the extent of punishment and place of trial, though the subject-matter is within the powers granted to the general government, no particular court has any right to try a person for doing these acts, or affix any punishment to them, as every court under the general government is limited to the trial and punishment of such matters, and such only as congress has been pleased to confide to it. [U. S. v. Bevans] 3 Wheat. [16

U. S.] 389; [M'Culloch v. State of Maryland] 4 Wheat. [17 U. S.] 407; Rhode Island v. Massachusetts, 12 Pet. [37 U. S.] 657, 721; 3 Kent, Comm. 333, 341, 364; 1 Kent, Comm. 363.

It has been repeatedly held, that though certain powers are granted to the general government, it is considered that no acts done against them can usually be punished as crimes without specific legislation. Thus, it is said: "The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offence." See U. S. v. Hudson, 7 Cranch [11 U. S.] 34 (Johnson, J.); [Turner v. Bank of North America] 4 Dall. [4 U. S.] 10, in note to Stanley v. Bank of North America. And again, that acts of congress, as well as the constitution, must generally unite to give jurisdiction to a particular court. 1 Kent, Comm. 294; [Turner v. Bank of North America] 4 Dall. [4 U. S.] 8; Clarke v. Bazadone, 1 Cranch [5 U. S.] 212; McIntire v. Wood, 7 Cranch [11 U. S.] 504. The circuit courts cannot act, unless the power is conferred by congress. Corfield v. Coryell [Case No. 3,-230]; Barry v. Mercein, 5 How. [46 U. S.] 103. It is unlike the king in England, who has divided all his judicial power among his several courts. So, generally, it is not enough to constitute an act a crime, that it is opposed to some law or the constitution, unless they declare it to be criminal or punishable. It often is but a civil injury or wrong. Evans v. Foster, 1 N. H. 374. Though in many cases, from the nature of the opposition or violation of a law, it may be criminal on common law principles, in other cases it would not be. Is it then an offence under the constitution by construction and a resort to any common law principle? In Ex parte Bollman, 4 Cranch [8 U. S.] 75, 93, the true guide in answering this question is given: "Courts, which originate in the common law, possess a jurisdiction, which must be regulated by the common law, until some statute may change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction" (Marshall, C. J., and page 102, Johnson, J.). Treason is defined in the constitution; but when cases are not clearly within it, courts will leave them to receive such punishment as the legislature in its wisdom may provide. Page 127.

It may also be deemed an exception to the requirement of a specific act of congress in every case, and for all purposes, if the constitution or a treaty should define a crime with precision, as the former does treason, and the latter do at times the crimes where surrenders shall be made, and in the latter the matter should also be within the authority of the treaty making power. (See the extradition treaties with France and England.) But unless they went further and in the constitution or treaty, or elsewhere, designated the court or magistrate to try or examine the offence, that must still be done by legislation, or the jurisdiction in any particular court could not be sustained. (See case of the British Prisoners (Case No. 12,734).) For all the courts of the United States being, as before explained, formed under a constitution of limited powers, and being courts of limited jurisdiction, a case must come within what is confided to any one of them before they can try it. The grant in the constitution of judicial power does not vest it in any court. But by another clause it is vested in the supreme court and such inferior courts as congress may from time to time establish. Congress, therefore, must say how much or what shall vest in one inferior court, and what in another; and how much by one act, and when the residue.

In Livingston v. Van Ingen [Case No. 8,-420], the court holds, that when an action at law is given in circuit courts, it does not follow that it may enjoin on the equity side, as no such express grant of jurisdiction is made; but it has been given since by act of congress in 1819. There is no power even in civil matters in this court to take cognizance of them, unless an act of congress has given it. Livingston v. Van Ingen [supra]. If so limited in civil cases, it is a fortiori in criminal cases. Courts when established, get only what is conferred on them by congress, and not what is in the constitution given to congress, except some jurisdiction which is there given to the supreme court, and will soon be referred to in detail. Much power remains dormant in congress, which it is not expedient to exercise at particular periods, or about which congress have not yet agreed how to legislate. Livingston v. Van Ingen [supra]; Corfield v. Coryell [supra].

To enable this court to act, a case must not only fall within the judicial power of the United States, as conferred by the constitution, but jurisdiction over it must have been conferred on the circuit court by some act of congress. Conk. Prac. 69, 88. Such cases alone are those described in the judiciary act, as "cognizable under the authority of the United States." U. S. v. Ravara [Case No. 16,122].

The same doctrine prevails as to a mandamus, except in the District of Columbia. McIntire v. Wood, 7 Cranch [11 U. S.] 504; [Kendall v. U. S.] 12 Pet. [37 U. S.] 524. So as to suits by the first United States bank, the act of incorporation being silent. Bank of U. S. v. Devereaux, 5 Cranch [9 U. S.] 61. So as to crimes. U. S. v. Hudson, 7 Cranch [11 U. S.] 32; U. S. v. Bevans, 3 Wheat. [16 U. S.] 336; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 76; U. S. v. Smith, Id. 153, 157; U. S. v. Grush [Case No. 15,268]; [U. S. v. Coombs] 12 Pet. [37 U. S.] 73; [Turner v. Bank of North America] 4 Dall. [4 U. S.] 10; 3 Kent, Comm. 363. It continues in this way till congress calls into action its otherwise dormant powers, which, as before remarked, it evokes slowly but seldom fully. [McClung v. Ross] 5

Wheat. [18 U. S.] 115, note; Conk. Prac. 70, 71; [Carneal v. Banks] 10 Wheat. [23 U. S.] 190. Indeed we must look entirely to the constitution, treaties, and acts of congress, to see what constitutes an offense in this court. The United States has no unwritten code to give it jurisdiction, though the common law, as before remarked, may be resorted to for analogies and definitions, where jurisdiction is conferred. Over civil cases in admiralty, jurisdiction is expressly given to the district courts by congress by a general grant, and to circuit courts an appeal in them, but not over criminal cases in admiralty, either to the district or circuit courts. Jurisdiction cannot be exercised over the last except as parcelled out and granted by particular acts of congress, or by some general transfer to this court of all cases of a criminal character in admiralty. Conk. Prac. 82, 83; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 387. The only cases contrary to this are U. S. v. Coolidge [Case No. 14,857], overruled in [U. S. v. Coolidge] 1 Wheat. [14 U. S.] 415, and dicta in De Lovio v. Boit [Case No. 3,776], and remarks in the note to [M'Clung v. Ross] 5 Wheat. [18 U. S.] 115, and in U. S. v. M'Gill [Case No. 15,-676], by Justice Washington. If concurrent jurisdiction is given to state courts in some cases, then the exclusive jurisdiction in the circuit courts is thus far modified. Houston v. Moore, 5 Wheat. [18 U. S.] 29. And a judgment in either, is probably a bar to a suit in the other. U. S. v. French [Case No. 15,-165]. Id.; 11 Johns. 519. But a mere arrest is not a bar. So a circuit court has no cognizance of military offences, that being by law conferred on courts martial. Id.; 3 Kent, Comm. 341. That is, probably, if happening on the high seas. 1 Kent, Comm. 362. Op. Atty. Gen. 114, 120.

I acquiesce in these principles and in this course of reasoning, as the safest and soundest in our complicated system of government, and one which has the sanction not only of the contemporaneous construction to this effect, placed on it by some of the framers of the constitution, afterwards seated on the bench of the supreme court, but of succeeding times, and of many of the statesmen and jurists of the last half century. It is an exception to a part of this reasoning for the previous action of congress, where the constitution itself provides for a supreme court, and declares some of the matters which shall belong to its jurisdiction, and hence takes from congress any power to dispense with such a tribunal, or to confer the trial of those specified topics on any other tribunal. See article 3, §§. 1, 2. Thus, "the judicial power of the United States shall be vested in the supreme court, and in such inferior courts as the congress may from time to time ordain and establish." Section 1. And "in all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the su-

preme court shall have original jurisdiction. This last has been amended. Amendment 11. In all the other cases before mentioned, the supreme court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the congress shall make." Section 2. This prevents congress from conferring original, or any but appellate jurisdiction on the supreme court in any cases except those specified. Marbury v. Madison, 1 Cranch [5 U. S.] 137, 173; 3 Croke, 75; [Ex parte Kearney] 7 Wheat. [20 U. S.] 42; [U. S. v. Hamilton] 3 Dall. [3 U. S.] 17. And it is another exception, or perhaps more properly speaking, an incident to the establishment of such a court and other inferior courts under the constitution, that they, like the legislative bodies of the senate and house of representatives, possess authority to punish for contempts in the transaction of the business entrusted to them. It is considered an authority inherent in such bodies appurtenant and indispensable, never necessary under any other governments to be conferred by particular laws, though open as this has been to subsequent legislation, modifying and regulating it, as was done after Judge Peck's impeachment, in respect to courts. See Anderson v. Dunn, 6 Wheat. [19 U. S.] 204; [Ex parte Kearney] 7 Wheat. [20 U. S.] 45; Act March 3, 1831; 4 Johns. 317; 9 Johns. 395; U. S. v. Hudson, 7 Cranch [11 U. S.] 33, 34; 6 Johns. 357; 14 East, 1; 5 Dow. 165; [Ex parte Bollman] 4 Cranch [8 U. S.] 94.

Having thus seen that this indictment cannot be sustained in this court, unless some law of the United States has declared it to be a crime, and given to this court jurisdiction over it, a necessity exists in the next place to examine whether any portions of the constitution, or treaties, or acts of congress have in fact done this; whether any of them have really prohibited as crimes such acts as those of the respondents, and empowered this tribunal to punish them. It is more convenient often, and therefore I am inclined to consider these last questions together, as they depend on like principles and precedents. I do not understand it to be contended that any part of the constitution, or treaties, or acts of congress specifically declares the placing such obstructions as those in navigable tide waters, like those at New Bedford, to be a nuisance, or any other offence against the United States, and punishable by fine or otherwise in this court. But the reliance is chiefly on general provisions and principles involved in them, supposed to be comprehensive enough to include this case.

The discussion on this branch of the case has taken a very wide range, and will receive, as it requires, some detail in its consideration, in order to cover the whole ground. I am not aware of any clauses in the constitution, relied on so much for this purpose, as that in section 8, art. 1, which provides that "congress shall have power" "to regu-

late commerce with foreign nations, and among the several states, and with the Indian tribes;" and that in the second section of article 3, declaring that "the judicial power shall extend to all cases in law or equity arising under this constitution, the laws of the United States and treaties made, or which shall be made under their authority," and "to all cases of admiralty and maritime jurisdiction."

We will therefore examine the effect of these clauses first. It will be seen that both of them relate to the powers conferred on congress by the people of the states, and not to the powers conferred by congress on any of the courts of the United States. They merely prescribe the extent to which congress may go in legislating as to commerce, and instead of themselves providing for details in the constitution, they wisely leave to congress to make such regulations as to commerce as it shall deem useful and proper, to define what shall be crimes against it, and declare how they shall be punished, and in what courts. U. S. v. Coombs, 12 Pet. [37 U. S.] 72. They proceed, also, to authorize congress in express terms "to define and punish piracies and felonies committed on the high seas, and offences against the law of nations" (section 8), but do not attempt it in the constitution itself. It will be manifest from all the expressions, no less than from the character of the instrument as a more general frame of government, and not one filling up and providing for details of legislation, that these clauses lay down rules as to the powers of congress, rather than the powers of this court and its jurisdiction. It leaves the latter powers as they should be left. to the discretion of congress and the public necessities and welfare, as these may from time to time require congress, within the scope of the authority thus conferred on it, to define and parcel out for trial whatever it may deem unlawful and properly punishable by the judicial tribunals of the United States.

Judge Chase says in a note to Stanly v. Bank of North America, 4 Dall. [4 U. S.] 10: "The notion has frequently been entertained, that the federal courts' derive their judicial power immediately from the constitution, but the political truth is, that the disposal of the judicial power, except in a few specified instances, belongs to congress. If congress has given the power to this court, we possess it, not otherwise; and if congress has not given the power to us or any other court, it still remains at the legislative disposal," and concludes it is not best for congress at once to go as far as it may. [U. S. v. Bevans] 3 Wheat. [16 U. S.] 387. See cases before. And such would seem to be the conclusion as to crimes by the admiralty law, by like analogies and reasons, except for the expression before referred to in the constitution, saying that the judicial power shall extend "to all cases of admiralty and maritime jurisdic-tion." But that is only one of the enumerated subjects like that "to regulate commerce," which before belonged to the sovereign control of each state, and which by the constitution it was provided should be thereafter placed under the control of the general government, and be acted on by its judicial tribunals. Chief Justice Marshall says in Bevan's Case, 3 Wheat. [16 U. S.] 387: "It proves the power of congress to legislate in this case, not that congress has exercised the power." After that provision, it was still necessary, in order to enable one of its tribunals to try cases of admiralty and maritime jurisdiction, whether civil or criminal, to confer such authority on them to try all such cases, or to try only that portion of them, which congress might then choose to legislate on, and define and entrust to such tribunals. The same necessity existed for the action of congress in this respect, as in respect to another enumerated grant to the judicial power over controversies "between citizens of different states." No court after being created by congress could have ventured to try such a case, under that grant merely in the constitution, without some legal provision, conferring that particular power on that court. And so as to "all cases in law or equity arising under this constitution, the laws of the United States. and treaties made or which shall be made under their authority," though placed within the judicial power of the Union rather than of the states, not one of those cases, whether of a civil or criminal character, could be tried by any particular court of the United States, till an act of congress empowered that court in particular to try it, with the exception before alluded to of cases affecting "ambassadors, other public ministers and consuls, and those in which a state shall be a party," and which with appeals are, by the constitution itself, conferred on the supreme court. The convention knew that admiralty power under the Confederation had been exercised by each state, except at times as to prizes. 1 Mad. Papers, 91, 105; 2 Mad. Papers, 712. They knew that in order to produce uniformity and regulate commerce, the power should thenceforward be exercised by the general government. Hence in the early drafts of the constitution to the supreme court was given jurisdiction over "all cases of admiralty and maritime jurisdiction." 2 Mad. Papers, 743, 744, and it was to be original there at first. The convention was at first opposed to having any courts but state tribunals and a supreme court of the United States; and after letting the former try all cases, permitted appeals to the supreme court. It, therefore, at first gave also to that supreme court admiralty and maritime jurisdiction, as being a matter not suitable for the state tribunals, and at one time struck out entirely any power in congress to establish "inferior courts." 2 Mad. Papers, 729. At last it restored inferior courts, and gave to the supreme court

still jurisdiction over admiralty cases and others now in the constitution granted to the judicial power. But it provided, that in other cases, except the trial of the president when impeached, jurisdiction might be devolved on inferior tribunals. 2 Mad. Papers. 1238. Towards the close (page 1556) it assumed the present form, and the jurisdiction of "the judicial power" was extended to admiralty cases, rather than that of the supreme court. But what is decisive, that in doing this they did not mean to adopt the whole admiralty code, criminal and civil, and confer jurisdiction over it on any particular court, but leave that to congress; as it might find it expedient, to define or adopt parts of it from time to time, it proceeded in another clause expressly to authorize congress to make definitions of piracies and maritime felonies. This would have been unnecessary and improper, if the whole admiralty code as to crimes had already been adopted. The reasons for this were, that different punishments in different states existed for these felonies, and as they were under admiralty power, and refer to foreign commerce, and are vague at common law, it was best to enable congress to make them more certain. 9 Mad. Papers. 1348, 1349, and in the Federalist (No. 42) it is also said: "But neither the common nor the statute law of that (Great Britain) or any other nation, ought to be a standard for the proceedings of this, unless previously made its own by legislative adoption." No. 42, by Madison.

When all the powers, not expressly granted to congress, or not necessary and proper to carry those granted into effect, are reserved cautiously to the people and the states, it would hardly answer to enlarge the powers of courts by a very broad construction. If the immediate delegates of the people were to be strictly restrained, much more should be their delegates in the judiciary, whose members are not subject to re-elections and short terms of office. These clauses, then, not seeming to grant these powers to this court, but rather to congress, can they be aided so as to make out the definition of a crime in this case, and confer the trial of it on this court by a resort to any other clause of the constitution or to the common law, or the admiralty law in connection with the constitution?

Looking for a constitutional definition of the present offence, and the power conferred on this court over it, and nothing being found done or completed in either of the great and leading clauses on this subject, that have already been considered, it was not likely to have been done in any other clauses, if not accomplished in those already examined. so important and so germain to the subject. It belonged to topics of commerce and admiralty jurisdiction, and to the power of courts rather than other matters. unless we were justified in expecting the unqualified adoption of some whole code of laws in a constitution. Had there been a provision in it like that of our ancestors at Plymouth Rock, respecting the Mosaic Code. directing the laws of any country or sovereign to be in force till congress could make better ones, and offences under them to be prosecuted in any courts created by congress, the difficulty in this case would have been cured, if the conduct of the respondents should amount to an offence under those laws. Or had there been a provision of a like tenor, adopting the common. law, or the civil law, or the admiralty law,. as a whole, and placing the execution of them in charge of this court, then our jurisdiction would be clear, if the acts complained of were made an offence under and by them. But no such clause exists, and none was likely to exist for reasons, some of which have already been alluded to, and. others that will occur to every reflecting mind. Beside the circumstance, that a constitution is generally designed to regulate the legislative department, as well as others, rather than to make the laws themselves, it is obvious from the great extent of territory and different systems of jurisprudence and numerous people to be operated upon by laws of the United States, that their agents could not find time in one convention to make a constitution and code of laws also, or consider how much of any existing code it was best to adopt absolutely. That they were not delegated to meet for the latter purpose; that, therefore, they did not attempt it; and consequently, instead of doing it or adopting any general code as a. guide, they merely empowered congress within certain limits to legislate on certain topics, and, with a view to prevent an interregnum, left of course the state laws in force till congress should do this, except where prohibiting expressly, or by strong implication, the further action of the states on certain subjects. Nor was the convention which formed that instrument ripe and ready to adopt absolutely even the common law, much less the civil or admiralty law, with all their details and with many uncertainties and much vagueness, as to their extent at different dates, and discriminating from which date they should be regarded, as. taking effect. [U. S. v. Smith] 5 Wheat. [18 U. S.] 182, by Livingston. The different states had conducted differently as to each of them; some introducing the common law as existing when their ancestors first emigrated hither; some as existing at the Revolution; and some, with large exceptions from it at both periods, of what did not accord with our situation and habits and new form. of government. Again, some had adopted much of the civil law in their courts of equity and courts of probate, and others but little, and that only as an appurtenant to their common law tribunals and jurisdiction, and some from their interior position, had adopted nothing of the admiralty law, and.

others little if any of it as existing peculiarly on the continent of Europe, and others more or less, perhaps, of what prevailed in England at the time of our Revolution. Hence it was wise not to wrangle and divide, as they must, by attempting to introduce, by means of the constitution, the common law of England, or of any one state, or of all the states, so far as it might be in force in all. The uncertainty, as to its extent, the difficulty of fixing it in cases of doubt, and the specific or general exclusion of all parts of it not suitable to our condition, were matters too formidable to be encountered in connection with their other great labors. It is also very inconvenient to adopt in any constitution any code as a part of the law of the land, without at the same time proceeding to make it alterable by legislation alone, as the interests and wants and experience of society might require. Otherwise the smallest change, however urgent, could not be effected, but with all the delay, expense, and formality of amending a constitution, or the whole organic form of government for a great people. Hence the common law of England has been considered as not put in force, directly or indirectly, by means of any clause in the constitution of the United States, so as to create, make, or help to make, any thing an offence, which has not been made so by the constitution itself, or acts of congress passed under it. Dup. Jur. p. 9, says: "The common law of the United States is no longer the source of power or jurisdiction, but the means or instrument through which it is exercised." See, also, Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 658; U. S. v. Worral, 2 Dall. [2 U. S.] 384; 1 Tuck. Bl. Comm. 378, notes; Serg. Const. Law, 274; Federalist, No. 42; U. S. v. Stephenson [Case No. 16,386]; U. S. v. Lancaster [Id. 15,556]; 2 Burr, Tr. 437, 482; Dorr's Case, 3 How. [44 U. S.] 103, 105; U. S. v. Coolidge, 1 Wheat. [14 U. S.] 415; Dup. Jur. Pref. xiv.; Goodenough, Am. Jur. 276; 1 Kent, Comm., 318, 319; 1 Story, Comm. 132, 137, 141; [Ex parte Bollman] 4 Cranch [8 U. S.] 75; U. S. v. Hudson, 7 Cranch [11 U. S.] 32; [Pawlet v. Clark] 9 Cranch [13 U. S.] 333; Ex parte Randolph [Case No. 11,558]; [Van Ness v. Packard] 2 Pet. [27 U. S.] 144; [Southwick v. Postmaster General] Id. 446; [The Orleans v. Phœbus] 11 Pet. [36 U. S.] 175; [Kendall v. U. S.] 12 Pet. [37 U. S.] 524. Contra, Jameson v. The Regulus [Case No. 7,198] note; [U. S. v. M'Gill] 4 Dall. [4 U. S.] 429 (Washington, J.). And however courts may properly resort to the common law to aid in giving construction to words used in that constitution and those laws (U. S. v. Palmer, 3 Wheat. [16 U. S.] 610, e. g. "robbery"), the body of the common law, as such, does not alone give jurisdiction in any case, and enable the court to declare any acts to be offences under the United States and to try them, where the constitution and the acts of congress have been silent concerning them. [U. S. v. Hudson] 7 Cranch [11 U. S.] 32; [U. S. v. Coolidge] 1 Wheat. [14 U. S.] 415; [Gelston v. Hoyt] 3 Wheat. [16 U. S.] 336; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76.

At the same time, in deciding on private rights in civil cases, which must often be according to the laws of the respective states, the common law will govern us so far as it is in force in each state. U. S. v. Stephenson; U. S. v. Lancaster [supra]; [Elmendorf v. Taylor] 10 Wheat. [23 U. S.] 158. But it will be as the law of that state rather than of the United States. So as to the admiralty law, as a code in civil or criminal matters, it is not adopted and put in force in this court by any part of the constitution. But congress is merely authorized to confer jurisdiction on its courts in cases arising under that law, though it has not yet done so except to the district court in civil cases, as we have already shown.

There being no definition of this particular offense as a crime in the constitution and no right to aid it in such a definition by the common or the admiralty law, and there being also no grant in the constitution to this court to exercise jurisdiction over it, but only a grant to congress to legislate upon such matters, the next inquiry is, has this defect been supplied by any provision in any treaty made in pursuance to the constitution? A treaty being, by the sixth article of the constitution itself, declared to be "the supreme law of the land," it will govern this case if full and detailed upon it. Sometimes treaties may require no appropriations to carry them into effect, or any change of existing laws, being minute enough and explicit enough to be enforced without any new or additional provision, and in such case, it may be the duty of the judicial tribunals to execute them without any act of congress. See British Prisoners [Fed. Cas. No. 12,734]. In other cases and generally, modified, or at least, declaratory, laws will be first necessary. But there is no pretence here that any treaty between this country, and any other, stipulates that obstructions like the bridge of the respondents and its consequences shall be deemed an offence, and be punished by this court on account of its injury to alien friends and their vessels in entering and departing from our ports and harbors. Such obstructions, however, may be prejudicial to foreigners, and to their rights under treaties if allowing trade and navigation here to be interrupted, whether the obstructions be temporary or permanent. But it would be difficult to try them as crimes, when no where declared to be so, or to try them by this court, unless jurisdiction over them is in some appropriate manner clearly conferred on it. Such an obstruction seems to violate the spirit of the treaty of November 19, 1794 (article 3), with England. It stipulated for each party "freely to pass and repass by land or inland navigation, into

the respective territories and countries of the two parties on the continent of America," "and to navigate all the lakes, rivers, and waters thereof, and freely to carry on trade and commerce with each other." 8 Stat. 116. It did not admit vessels "into seaports, harbors, bays, or creeks of his majesty's said territories, nor into such ports of the rivers in his majesty's said territories, as are between the mouth thereof and the highest port of entry from the sea," except in small vessels between Quebec and Montreal, nor yield the admission of British vessels from the sea into rivers of the United States beyond the highest ports of entry for foreign vessels from the sea. But it meant to permit such free navigation up to the highest port of entry here for foreign vessels from the sea; yet no clause has been found in this or any other treaty, making obstructions like these crimes, if placed within the limits of such ports or below them, and giving this court cognizance of them. Whether a civil action would not lie in such case for delay and damage by an alien friend, against the respondents, or by one of our own citizens, without any further legislation, and under existing treaties and existing laws, is a different question, and one to which some attention will be given before I close.

The only other legitimate source of power by this court over this case, is some act of congress. Conk. Prac. 57. None giving it, eo nomine, has been referred to; none is pretended to exist. The one most relied on in support of it substantially, is that of 1789, which in section 11, gives to this court jurisdiction "of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct." 1 Stat. 79. But this seems to relate rather to the power of the circuit court to try this case, if a crime, than to make it a crime. Though it is contended by the counsel for the government, that it is an adoption and grant to this court of jurisdiction over all offences which exist under admiralty and maritime law, because all such are "cognizable" under the constitution, and hence "under the authority of the United States," and that the acts now in question are crimes by admiralty law. But if the words "cognizable under the authority of the United States," were meant here to embrace all offences over which the judicial power was extended by the constitution, it would cover all other offences, under that constitution or treaties, without any acts of congress being necessary to define them and confer jurisdiction over them on this court. Again, "cognizable under the authority of the United States," used here as applied to a court, means of course, "triable," or placed under its jurisdiction by the constitution, or treaties, or laws of the United States. See Kendall v. U. S., 12 Pet. [37 U. S.] 524, 637, 648. The word is so used by Blackstone in speaking of "injuries cogniza-

ble by the courts maritime or admiralty courts." 2 Bl. Comm. 106. So Bayley, J., says: I think the true construction of this statute is to restrain the operation of the 4th section to cases cognizable in the superior courts. Rex v. Crisp, 1 Barn. & Ald. 282, 287. This act might mean, that the circuit court should exercise jurisdiction over all matters which were made crimes by the constitution or laws, when no particular court was otherwise designated that should try them. But it still leaves the question open, What is a crime by that constitution or those laws? And till the acts complained of in this case are declared to be crimes by the constitution or laws, this court, though having cognizance of all crimes which exist under them, cannot pronounce any acts to be crimes within their purview.

A different construction, if competent under the words of this act of congress, does not seem to accord with its spirit or cotemporaneous construction by congress and the courts. It was early seen that a different course would leave the whole criminal code vague, loose, undefined and uncertain, where certainty in all countries is most desirable. That specific legislation under the general grant in the constitution, would be much safer to property, liberty and life. And finally, that the construction, limiting the expression, "cognizable under the authority of the United States," to what was made cognizable as a crime by any part of the constitution or by any act of congress, was more in unison with the strictness belonging to all criminal codes. Accordingly, under this view, specific legislation at once commenced defining special offences, which otherwise would have been unnecessary. Besides this, the courts of the United States at once held, as before shown, that this kind of legislation was first proper and necessary, in order to make even ordinary offences "cognizable under the authority of the United States," so as to be tried by this court. Other considerations tended to sustain the idea, that this expression as to "authority," referred to what was implicitly enacted by congress, or expressly declared in the constitution to be crimes, rather than all which might possibly be done by congress under the constitution. Again, had congress declared, that all acts criminal by admiralty and maritime law should be so here, (and certainly, if going further, had said, also, that they should be tried by this court, as offences under the constitution of the United States,) then, probably, they might have been cognizable by us under its "authority," in the same way that congress, having conferred the trial of all civil cases in admiralty on the district courts, they are all triable there. Similar provisions would probably have been made in both cases if the course meant to be pursued was the same in both; and if nothing was said as to the kind of punishment, it might perhaps be as the punishment was in admiralty generally, (or possibly by fine and impris-

onment,) and be prosecuted by indictment. For, whatever the law declares to be a crime, it is said must be prosecuted here by indictment, unless a remedy by information is specially given. U. S. v. French [Case No. 16,165]; U. S. v. Mann [Id. 15.718]; [U. S. v. Tyler] 7 Cranch [11 U. S.] 285. But considering the jealousy of our ancestors as to courts of admiralty, on the ground, that except on confession, for which torture was once used, the proof must be equal to two witnesses, and that no trial by jury was allowed till 28 Hen. VIII., with other reasons hereafter alluded to, the framers of the constitution would not be very likely to mean to adopt its criminal code en masse. Under 28 Hen. VIII., the definition of crimes remained, but not the rules of evidence or trial without a jury. 5 Dane, Abr. 342. And though some of the ancient objections to the admiralty are obviated here by trial in crimes by jury, yet those in respect to its system of proofs in criminal cases might remain, and the prejudices on this subject prevented the exercise of much admiralty power over crimes before the Revolution in any of the thirteen provinces. and still less on any matter during the Revolution and afterwards till the adoption of the constitution, except as connected with subjects of prize. Bains v. The James & Catherine [Case No. 756]. Perhaps I ought to except revenue matters, as by 7 & 8 Wm. III., admiralty courts were allowed to control those here, and punish in a king's court rather than in a colonial one, in order to deprive the colonists of trial by jury when enforcing obnoxious laws of trade. 6 Dane, Abr. 342. If this was in one sense acquiesced in after much resistance, as hopeless to be remedied (see [U. S. v. Bevans] 3 Wheat. [16 U. S.] 384, 385, arguendo the history of it), it was considered a great grievance in principle, as will be hereafter shown, and a topic of loud, long and most indignant remonstrance, till ended by the Revolution. See on this the opinion of the minority of the court in Waring v. Clarke, 5 How. [46 U. S.] 441. To the illustrations there given, may be added the express provision in the bill of rights in the constitution of New Hampshire (article 20), that the trial of jury shall be sacred in all cases, except those happening "on the high seas," and "seamen's wages."

It is true at the same time, that when forming a general government, whose chief duty was in respect to foreign affairs and foreign commerce, and its regulation not only abroad. but between the states, the sagacious framers of the constitution saw that it should be invested with all the admiralty and maritime powers which might be proper to be exercised within our own territory. Hence they conferred the exercise of them on that government, but still left that government in its legislation to bestow at once, or gradually, all or a part of the civil powers in admiralty on such courts as it deemed most appropriate, and all or a part of the criminal powers in admiralty in a like manner, under such limitations and restrictions of every kind as it might think useful. Hence, likewise, congress, in order to carry on at once the ordinary business in admiralty, connected with commerce and navigation, bestowed all power "in civil cases" on the district courts. But it saw and knew the difference between the clause in the constitution and their own legislation, and instead of copying it so as to embrace "all cases in admiralty," limited the power given to only "civil cases" in admiralty. Now, if congress intended to reserve the criminal cases in admiralty, and bestow a jurisdiction over them generally on the circuit court, it would probably have proceeded to do so in terms ipsissimis verbis. But, instead of that, it then and since merely selected out particular cases of admiralty offences, defined them, and conferred jurisdiction on this court over them under certain limitations and without specifying whether it exercised power over them as crimes in admiralty, or under its authority to regulate commerce, or under some other constitutional grant. Indeed, it is hardly to be presumed that congress intended by the act under consideration to confer power on this court to try. as a crime, any thing which might be made a crime. but which had not been made nor defined to be one, either in the constitution itself or any law, when such caution was used in defining some crimes, and imposing restrictions and limitations as to others.

The act of March 3, 1825, which defines so many, and makes them, like others enumerated in the act of 1790, specifically punishable in the circuit court, generally does not give jurisdiction to this court, unless the offence is defined and its punishment prescribed, if on the water, as committed on the "seas," or "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state." See sections 4, 6.

Generally, too, cases of crimes come to this court only where a state has no jurisdiction. [Waring v. Clarke] 5 How. [46 U. S.] 441. Such was the definition by Blackstone of the admiralty court, to try cases without the jurisdiction of the common law courts on the seas. It is a wise policy to leave as much with the states as may be, though congress has the power to go further in some cases if it pleases. [Turner v. Bank of North America] 4 Dall. [4 U. S.] 11; [Bank of U. S. v. Deveaux] 5 Cranch [9 U. S.] 61; Bains v. The James & Catherine [supra]; [Rhode Island v. Massachusetts] 12 Pet. [37 U. S.] 721; [Martin v. Hunter] 1 Wheat. [14 U. S.] 326: [M'Culloch v. Maryland] 4 Wheat. [17 U. S.] 407; [U. S. v. Bevans] 3 Wheat. [17 U. S.] 389.

Another forcible reason why congress did not mean to have any criminal cases in admiralty, "cognizable" as such by this court, originally, was, that this was not the ad-

miralty and maritime court created by congress under the constitution. Jensen v. Vrow Christina Magdalena [Case No. 7,-216]. That was the district court. [Glass v. The Betsey] 3 Dall. [3 U. S.] 6. And had congress intended to confer general criminal jurisdiction in such cases on any court, it would have been likely to have given it to that court as it did the civil cases, and allowed the trials in the former to be by jury there, as they must have done under the sixth amendment of the constitution, as well as under a provision in the body of it. Article 3, § 2. Appeals in cases criminal as well as in civil could have been allowed to this court; but without an express allowance, this court never has got any jurisdiction by general grant or implication as a court of admiralty, because it was not such a court originally, and was never converted into one since. The Vrow Christina Magdalena [supra].

It is another decisive objection to a construction of the act of 1789, which would, under the words "cognizable under the authority of the United States," embrace all admiralty crimes, as existing here or abroad at the Revolution, that this branch of our criminal code would thus be left very uncertain as to the crimes themselves thus intended to be embraced. Laws defining crimes should be precise and clear, so that all men may know easily what they are to avoid. U. S. v. Sharp [Case No. 16,264]. And it is most dangerous, by mere construction, to convert that into an offence which is otherwise permitted. By the opposite view it would be left uncertain at what era and place the admiralty law, as to crimes, was meant to be adopted, and thus doubtful whether this very offence, described in this indictment, was intended to be embraced, and questionable whether the kind of punishments in any case, where the punishments happened to vary, was to be affixed according to Rhodian or Roman law, the assizes of Jerusalem or the consular system, the Danish, French or English codes, or those of some other period and people since the voyage of the Argonauts.

It is a matter of some regret that congress had not been a little more slow, cautious, and discriminating, when they conferred jurisdiction in all civil cases, and had not either enumerated what it considered properly as civil cases in admiralty, specifying subjects and places, or referred to some era, or code, or country as to its civil admiralty jurisdiction as a guide. Misera est servitus ubi lex est vaga aut incerta. For now in that, as we should be obliged to do in crimes, had power over them been given, one judge thinks he ought to go to the Rhodian laws for the test, another to the Consulato del Mare, another to the laws of Oleron, another to those of Wisby, another to the era before Richard II., another to the black book of the admiralty, another to 13 and 15 Rich. II., another to the act of parliament of 28 Hen. VIII., and others to periods still later. See [Waring v. Clarke] 5 How. [46 U. S.] 441. Some trace the power which is to be the standard, to Saxon, some to Norman, some to Saracen or Carthagenian, some to Roman, and some to Turk or Crusader. Again, one judge gets admiralty jurisdiction both criminal and civil by the locality of the act, as if on the ocean at all; another, if on it, where the tide ebbs and flows; another, if on it, without the limits of a country; another, if on great rivers navigable below their bridges, though not salt; another, by the subject-matter, if maritime or not; another, by the parties, if seamen or landsmen. See cases in the precedent last cited. This same uncertainty exists about what are maritime contracts, as may be seen by the order of the supreme court at the same session for a re-argument in New Jersey Co. v. Merchants' Bank [6 How. (47 U. S.) 344], in a libel on a domestic charter party in admiralty, where the court was supposed to be equally divided as to jurisdiction. Such vagueness and uncertainty, even in civil cases, have agitated the courts of the United States the whole half century of their existence, and it may have been foreseen, as still more objectionable, in respect to the crimes punishable in admiralty, and probably this helped to lead to a refusal to legislate in the same general way as to them. As to them they have selected out particular and urgent cases for punishment, within careful limits, as to the places where they occurred, and made them punishable in such cases only, leaving the others to the state tribunals, till some failure of justice or emergency for new power to prevent guilt from escape, should justify and require further provisions for punishment by the courts of the general government.

That these are no imaginary uncertainties, which stand in the way of supposing such a code was meant to be adopted in cases where life and liberty were at stake, some judges have deliberately held, that we should go to the continent of Europe to ascertain what our admiralty law is, and not to England. See cases in the precedent just referred to. Others, that we must go to England alone. They differ vitally, also, as to eras of the admiralty, when its laws and practice are in force here, whether civil or criminal, and going only to England for the law, as most do. U. S. v. McGill [Case No. 15,676]. Some hold, that the constitution referred to the admiralty law as existing in England before the important legislation of 13 and 15 Rich II. See in [M'Clung v. Ross] 5 Wheat. [18 U. S.] 114, note; Conk. Prac. 145; The Amiable Nancy [Case No. 331]. And again and again it is insisted that these statutes, the great landmarks of admiralty law in England, are not in force here at all. See The Jerusalem [Case No. 7,294]; De Lovio v.

Boit [Id. 3,776]; Hall, Prac. 17 Pref.; Stevens v. The Sandwich [Case No. 13,409]; Steele v. Thacher [Id. 13,348]; [Waring v. Clarke] 5 How. [46 U. S.] 441. While others maintain that they involved the inestimable trial by jury, and the highly prized principles of the common law against the civil code of a foreign conqueror, and came here with our fathers as much as Magna Charta itself, and were in as full force in Maine and Georgia as in the county of Kent or Bristol in England. See [Waring v. Clarke] 5 How. [46 U. S.] 441 (opinion of minority). Others hold the admiralty law throughout to be as it was in England when our ancestors emigrated here. Ramsay v. Allegre, 12 Wheat. [25 U. S.] 612; (Johnson, J.); 1 Kent, Comm. 377; Conk. Prac. 155. Others limit it as in use in America at the time of our Revolution, and thus collecting it rather from the obscurity and darkness of colonial practice than any other more certain sources. De Lovio v. Boit [Case No. 3,776]; Hart v. The Littlejohn [Id. 6,153], note; The Amiable Nancy [Case No. 331]; Peele v. Merchants' Ins. Co. [Id. 10,905]; Bains v. The James & Catherine [Id. 756]; Ramsay v. Allegre, 12 Wheat. [25 U. S.] 638 (Johnson, J.). Others modify the time to the period of the adoption of the constitution, which is much the same in effect. 1 Kent, Comm. 377; Parsons v. Bedford, 3 Pet. [28 U. S.] 446. The sounder opinions seem to me those which incline to these last eras. U. S. v. M'Gill [supra], and cases in Waring v. Clarke, 5 How. [46 U. S.] 441. And if a foreign code be thus adopted in the grant of power to congress over it, or in the act of congress as to civil admiralty cases in the district courts, it must probably be considered the code as then existing, and not as at some prior period. Kendall v. U. S., 12 Pet. [37 U. S.] 524. Thus in England, the control and curtailments which had been exercised by the common law courts, were recognized as proper and obligatory, according to some, and the admiralty courts had at last submitted in England to the claims of the common law courts, and the contest was at a rest. 1 Law J. 425; Hall, Adm. But the supreme court ([Waring v. Clarke] 5 How. [46 U. S.] 441) has recently, by five to three of its members, given a judgment in a case of collision of vessels on the Mississippi, two hundred miles above the ocean, and where it is very doubtful whether the influence of the tides is felt at all, and within the heart of a county in Louisiana, for reasons entirely different from some which have been suggested by me as the true test of what admiralty law ought to prevail here. But those reasons being dissented from by four to four of the court, I do not undertake to state or adopt them, though the judgment of the court on the point then in controversy is binding, and will be respected by me till changed. But that judgment is confined to maritime torts, not embracing the subject of crimes now under consideration. In short, then, if we look to English decisions as to crimes, being those referred to in "cases of admiralty" in the constitution, and in the act of 1789, the English precedents are to control us. There the admiralty court is governed by the civil law, the law marine and law merchant, unless where those laws are controlled by the statute law of the realm or by the authority of the municipal courts, which unquestionably possess a superintending power, and might restrain that court, should it overstep the just limits of its jurisdiction. The Neptune, 3 Hagg. Adm. 129, 136. See "Prohibitions," 3 Bl. Comm. 112; Curt. Merch. Seam. 344; Zane v. The President [Case No. 18,201]; 6 Lane, Abr. 350, "Prohibitions." Except in prize admiralty jurisdiction, these powers must extend or contract as "authorized usage and established authority" require, but not go beyond these, as it is a suspected jurisdiction, not being exercised with juries. 2 Hagg. Adm. 55. In fine, then, according to such views, the maritime laws of England, in force or existing at our Revolution, must be the chief guide. Few admiralty decisions were then reported, and we must go to common law courts for cases and rules, as to them, when in collision. Gardner v. The New Jersey [Case No. 5,233]; Thompson v. The Catharina [Id. 13,949]. Next the Roman and civil law, where no English cases or statutes are to be found. Walton v. The Neptune [Id. 17,135]. We must include in English, the laws of Oleron, &c., except as by statute overruled and disused in case of punishments harsh and barbarous. Walton v. The Neptune [supra]; Com. Dig. "Admiralty," E. 112; Percival v. Hickey, 18 Johns. 257, 292.

Courts of admiralty do not proceed according to the law of nations, except in cases of prize (18 Johns. 271, arg.); or unless suits are brought in admiralty under the law of nations, on the instance side of the court (18 Johns. 279, arg.; Doug. 648). There if the common law is resorted to for a definition or principles, it covers the law of nations, as whatever is penal by the law of nations is by the common law. [U. S. v. Smith] 5 Wheat. [18 U. S.] 176, note.

But to show still further uncertainties in the admiralty law, if adopted en masse as to crimes, some others, in the teeth of all this, hold, that the decisions of the common law courts in England, restraining and limiting the admiralty jurisdiction, though well settled before A. D. 1776, are not to be respected and enforced here. The Jerusalem [Case No. 7,294]; Ex parte Lewis [Id. 8,310]; Plummer v. Webb [Id. 11,233]. Those who hold these doctrines, and go to ages before 13 Rich. II., and to the continent of Europe for guides on points well settled in England by statutes and decisions before our Revolution, make every thing vague and afloat on a sea of uncertainty.

If we go to those early ages, to the birthplace of admiralty law in the Mediterranean, where consular courts may have preceded those called admiralty, and where those of the "fisc" may have embraced some admiralty as well as revenue powers, and where under different nations, different forms of government, and in different advances of civilization, different punishments and crimes and rules of admiralty law clearly did prevail on many points, which are we to be governed by? If we were to take the admiralty law as in force here about crimes, and "cognizable under the authority of the United States" by this court, and as it existed elsewhere than in England. or here at the Revolution, which is insisted on in this case as in many others ([Waring v. Clarke] 5 How. [46 U. S.] 441, and cases cited), all would be uncertain, not only on this, but still other accounts. In Holland, the care of mounds and dikes was confided to the admiralty; in Denmark and Sweden, of the marine; in England, of the navy; in France, of the fisheries. Stevens v. The Sandwich [supra]. It was of little consequence, comparatively, on the Continent, to preserve any settled lines between the admiralty and other courts, as all of them followed the civil law. and had no trials by jury. But when an attempt was made to transfer admiralty courts and powers to England, in which the common law and not the civil prevailed, and the barons, as in Magna Charta, avowed that they were unwilling the laws of England should be changed, nolumus leges Angliæ mutari quæ hujuscunque usitatæ sunt et approbatæ, it soon became important, to protect themselves in the enjoyment of the common law and of the trial by jury, to limit admiralty jurisdiction as was done by 13 and 15 Rich. II., and again, as further modified, in 28 Hen. VIII. It is just as important in this country as in England to discriminate between what really belongs to the admiralty system and courts as admiralty, and what not, and what has of late been conferred on them by statute, which did not belong to them on mere admiralty principles. Indeed it is more important here on account of state laws and state rights; because in the last, as in other things not theirs, not belonging to courts of admiralty at our Revolution, the trial of jury is still a right of the people, and the course of the common law in evidence, and a court composed of more than one judge, and a trial by neighbors in their own state tribunals and by their own laws, rather than at a distance and by a different code.

Finally, these conflicts and uncertainties as to what belonged to the admiralty as such, even in civil cases, is one of the strongest reasons for not adopting by a forced construction merely of the constitution, under the act of 1789, the still more vague and doubtful code of admiralty as to crimes.

But there are stronger objections to the idea that our fathers intended by the act of 1789 to confer on this court a cognizance of all the admiralty crimes that existed in England or on the continent in the fourteenth century. A brief reference to the establishment and curtailment of the admiralty power in England, will demonstrate this. The admiralty court was considered by the people of England as an intruder from abroad, not tolerated in its large claims for a single half century, and more and more obnoxious here as well as in England, to the very moment of the Revolution; and hence its powers were not likely to be extended or enlarged here, or hastily adopted and enforced as to crimes. Even the word "admiral" or "admiralty," however long existing in France, or Turkey, or the Mediterranean, or in Arabia ([U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 106, note), appears in the English language but seldom before the fourteenth century, and then Edward III. first organized the admiralty court as a court. Note to [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 113; 2 Bl. Comm. 64, 69; Bac. Abr. "Court of Admiralty." All the records and commissions before King John, if any existed, are said to be lost. Com. Dig. "Admiralty Court"; Selden, Mare Clausum, bk. 2, c. 14. But it is very probable that the whole regular establishment of the admiralty did not exist two generations before 13 and 15 of Rich. II., the immediate successor of Edward III., limited and checked by the parliament, as it deprived the barons of some privileges as to wrecks, and introduced new laws, as the civil, and new modes of trial, as not by jury, and new kinds of evidence, by forced confession or two witnesses. See 28 Hen. VIII.

The practice before Richard II. had been for admiralty without juries, certainly in contracts, and by rules of the civil law to extend jurisdiction so far, that more than half of the commercial jurisprudence of the realm was absorbed in it. [Ramsay v. Allegre] 12 Wheat. [25 U. S.] 616 (Johnson, J.). Its power was not perhaps so much an usurpation on what was practised in other courts on the continent, all of whose tribunals were governed chiefly by the civil law and without juries, and hence magnifying and enlarging admiralty power, did not encroach on the rights of parties there and rules of decision, and on judicatories governed by different laws. But in England, it was a deep and sudden inroad on the former laws of the realm and rights of the people, and was strenuously resisted. The Conqueror was regarded in the eleventh century as prostrating English liberties (Thompson on Magna Charta, p. 1), and one of the new instruments for it, under his successors, was the court of admiralty. One of the great engines by the barons and the people, to protect themselves, was the first charter about the year 1100, under Henry I., and again the great charter, towards the close of that century, under King John, and in which, in article 25th, it was expressly guaranteed, that thereafter persons be tried "according to the judgment of their peers

in the king's courts." Thompson's Charter, p. 54, and also p. 55, art. 29. And after the continued breaches of these charters so as to require from thirty to forty compulsory renewals and confirmations of them, a further resort was had to acts of parliament of a more stringent and precise character against the encroachments by the admiralty courts. The nature as well as cause of the curtailment then made of its general claims as to criminal jurisdiction, is no where so well embodied as in the terse and pointed language of the act of parliament itself (13 Rich. II.): "Chapter 5. What things the admiral and his deputy shall meddle. Item.—Forasmuch as a great and common clamor and complaint hath been oftentimes made before this time and yet is, for that the admirals and their deputies hold their session within divers places of this realm as well within franchise as without, accroaching to them greater authority than belonged to their office, in prejudice of our lord the king and the common law of the realm, and in diminishing of divers franchises and in destruction and impoverishing of the common people, it is accorded and assented, that the admirals and their deputies shall not meddle from henceforth of any thing done within the realm, but only of a thing done upon the sea, as it hath been used in the time of the noble prince, King Edward, grandfather of our lord the king that now is." 1 Stat. 385, Ruffhead. To remove any evasions by the general expressions here used of the realm or the sea, this was followed in two years by another statute (title 15. Rich. II. 1391): "In what places the admiral's jurisdiction doth lie." There had been complaints of his encroachments and injuries to king and cities, and is herewith "established that all manner of contracts, places and all other things rising within the bodies of the counties as well by land as by water, and also of wreck of sea, the admiral's court shall have no manner of cognizance, power nor jurisdiction," but shall be tried "by the laws of the land." "Nevertheless of the death of a man and of a mayhem done in great ships being and hovering in the main stream of great rivers only beneath the bridges of the same rivers nigh to the sea, and in none other places of the same rivers the admiral shall have cognizance." This, it will be seen, first limited the criminal as well as civil jurisdiction to acts not done within the body of a county, whether on land or water, except in great ships on great rivers, murder and mayhem, and thus excluded the present case. This is still the law in respect to crimes, in England. Co. Litt. 260; 2 Browne, Adm. & Civ. Law, 487; De Lovio v. Boit [Case No. 3,776]; La Caux v. Eden, Doug. 594; 4 Coke, 137. If the exception there, "beneath," that is, "below" the bridges, used the word "pountz," in Norman French, which meant points or capes of the

land and not "pons," bridges, as some contend (Owen, 122; [Talbot v. Three Brigs] 1 Dall. [1 U. S.] 106, note; 3 Rowe, Hist. E. L. 198, note), then the places below them were deemed a species of haven outside of the county, and was in keeping with the rest of the act. But no similar provision exists in our legislation about crimes, and if it enlarged admiralty power any in England, we have in this respect shown a disposition to limit or narrow it more than even in 13 Rich. II.

In the struggles of the two following centuries, further curtailments rather than enlargements took place in England in respect to crimes. Hence, after passing first 13 and then 15 Rich. II., throwing the common law jurisdiction over most offences, instead of admiralty, and especially within the body of counties, though on navigable water, next came 28 Hen. VIII., bringing under the cognizance of common law judges in part, and of juries and of common law principles, all the crimes before left for trial in the admiralty courts, and committed even on the high seas and without the body of a county. 2 Browne, Adm. & Civ. Law, 458; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76, 115, note. See the whole statute in 4 Pick. St. 441, and interesting matters connected with it. 3 Inst. 111; 6 Dane, Abr. 350; Bains v. The James & Catherine [Case No. 756]. It was under this statute that the notorious Captain Kidd was tried at the Old Bailey in 1701, for offences committed in India and elsewhere, charged to be "in admiralty jurisdiction," and by a commission, partly of common law judges, "to execute the office of lord high admiral." 14 How. State Tr. 230, 297. It is said in some books (see cases before cited, and Hall's Prac. XVII. Pref.) that these two statutes do not extend to the colonies in terms. This is true, because these colonies did not then exist. And in Stevens v. The Sandwich [Case No. 13,409], Judge Winchester thinks those statutes, as construed in England, did not apply here. So Steele v. Thacher [Id. 13,348], and De Lovio v. Boit [Id. 3,776]. But in all these, the remarks concerning them are in connection with contracts and not crimes. Our fathers had grown up under those statutes, were attached to their principles, and that of 28 Hen. VIII. came here so, and continued so, as regards crimes. See fully [Waring v. Clarke] 5 How. [46 U. S.] 441. Why not then take admiralty law as in England, at our Revolution, and not as before Rich II., as respects crimes, except as changed in England in the form of trial before our Revolution, by 28th Hen. VIII.? All these statutes, when enacted, extended to all Englishmen, English rights and English liberties, and they have been carried with them, when emigrating to every quarter of the globe as their birthright. All such statutes, as well as the common law, when not inapplicable to our condition (Hal-

sey v. Fairbanks [Case No. 5,964]), were insisted on as a part of our colonial and inestimable privileges. See the case of Waring v. Clarke, 5 How. [46 U. S.] 441, and cases cited there, and Mayo v. Wilson, 1 N. H. 53, 58; Houghton v. Page, 2 N. H. 42; State v. Rollins, 8 N. H. 550; 1 Story, Const. 140, note; [Wheaton v. Peters] 8 Pet. [33 U. S.] 688. They were conformed to in most of the colonies, and their vice admiralty courts, as regards the limits of counties, the common law and juries as to crimes committed within them, till the Revolution, and even to the adoption of the constitution, so far as any traces of such trials can be found here. [Ramsay v. Allegre] 12 Wheat. [25 U. S.] 638, semb.; Bains v. The James & Catherine [Case No. 756]. And crimes never appear in our colonial existence, to have been tried here in admiralty courts, or on admiralty principles, and by the civil law in force there, without juries, except under two express statutes, under Wm. III. and Geo. I., passed to tyrannize over the colonies, crimes were sometimes attempted to be tried by commissioners in vice admiralty courts without a jury. In such a case, in 1769, that court held it had the power to try in Massachusetts a seaman, who had killed a lieutenant for attempting to impress him. But under a vehement public indignation, he was acquitted. Hutch. Hist. of Mass. Bay, p. 236. The admiralty, likewise, was none the less liked by our fathers, because it was one of the instruments used at home, as well as here, to enforce impressments. Com. Dig. "Admiralty, G." Beside this, by 7 and 8 Wm. III. the admiralty courts were made the instruments to punish violations of the laws of trade and navigation in the colonies, and the appointment of their judges were taken by the crown from the lord high admiral (3 Hagg. Adm. 279), and penalties were prosecuted there, and our fathers stripped of jury trials in such cases, and subjected to vexatious forms of proof, the burthen being flung on the claimants in case of seizures, rather than the government, and the informer shielded from costs.

This was resented no where more highly than in Massachusetts, and instead of being acquiesced in gradually, was resisted till the Revolution itself. Thus the Massachusetts house of representatives, in the preliminary contest some years before the Revolution, passed the following resolve (State Papers Mass. p. 51, 1768–1770): "(13) Resolved, that the extension of the powers of the court of admiralty within this province, is a most violent infraction of the right of trials by juries; a right which this house, upon the principles of their British ancestors, hold most dear and sacred; it being the only security of the lives, liberties, and properties of his majesty's subjects here." See Steele v. Thacher [Case No. 13,348].

A volume of similar expressions of censure on the admiralty encroachments here on jury trials and other rights of the colonies, might be presented. In the old congress, in 1774, it was declared to be a special and great grievance to be tried in admiralty for acts "arising within the body of a county." Bains v. The James & Catherine [supra]. In the Declaration of Independence, too, one grievance was "for depriving us in many cases of the benefit of trial by jury." See more fully on this, Waring v. Clarke, 5 How. [46 U. S.] 441 (opinion of the minority). Beside what is stated there, it is not a little curious that our forefathers, in only three years after landing at Plymouth Rock, "ordained, 17th December, 1623, by the court then held, that all criminal facts, and also all matters of trespass and debts between man and man should be tried by the verdict of twelve honest men, to be impannelled by authority in the form of a jury on their oaths." Russell's Guide to Plymouth, 169, note. It is shown fully in [Waring v. Clarke] 5 How. [46 U. S.] 441, how tenaciously our fathers insisted that they brought with, and continued in force in the colonies, all laws and rights favorable to the subject, and as to them were stern as the barons of old, in Magna Charta, against changes and encroachments. So, unless by positive statutes at home, admiralty power continued here unenlarged, and rather restricted from what it then was in England, than widened, as many have conjectured. Probably the admiralty in England submitted at first to curtailment with more grace, as the lord high admiral, whose "deputy" the judge in admiralty is (2 Browne, Civ. & Adm. Law, 457), was still allowed to hold naval courts martial in fleets and ships, for trying all naval offences, and thus keeping up a police, and preserving the public peace, not only in ships of war, but on the great highway of nations. Id. 487. And the odium attached to capital trials and punishments by courts martial without a jury, would have been such as tending to abolish them, if the parties had not by the terms of enlistment voluntarily stipulated for such trials by military peers, and the exigencies of war did not often render their speedy and summary mode of procedure almost indispensable.

In the mutiny act of 22 Geo. II., a special proviso is introduced, that the powers of naval courts martial shall not extend to any matters still left to admiralty jurisdiction. 1 McArthur, "Courts Martial," 174; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 360, note. And an additional reason, corroborating all this, is, that the admiralty court had not for two centuries in England as an admiralty court, but only through a commission, including other judges and a trial by jury, had any jurisdiction over felonies; and it was doubted whether it had any over misdemeanors at all. Indeed, another strong illustration of the strength of public sentiment in England against trials in the admiralty for any offences whatever, is, that though 28 Hen.

VIII. is in terms relating, not to misdemeanors, but only felonies, yet since its passage, no crimes whatever, whether misdemeanors or felonies, are tried in the court of admiralty by the judge of admiralty alone; but they are all tried by a jury, and all prosecuted in the courts of common law or under a commission, or under special statutes. 2, Browne, Civ. & Adm. Law, No. 3 App. 519; 2 Chit. Bl.; Corfield v. Coryell [Case No. 3.230]. In truth, the better opinion is, that admiralty courts, at the time our constitution was adopted, did not punish misdemeanors; and hence there must be an act of congress to punish such misdemeanors, or no jurisdiction over them exists in the circuit courts. Corfield v. Coryell [supra].

In accordance with this view, by 29 Geo. III., it was enacted, that all other offences than felonies, committed on the high seas, be tried by a commission as by 28 Hen. VIII. Russ. & R. 1, note. And so far from there being any disposition evinced here to depart from such restraints, that the framers of the constitution, in giving congress a power to define "piracies and felonies committed on the nigh seas," undoubtedly meant to go as far as had been gone by 28 Hen. VIII., and cover all offences tried in the admiralty since then, and leave nothing to loose and general construction, as to what was and what was not an offence merely by admiralty law. They meant further, by the 4th and 6th amendments of the constitution, to secure the use of a grand jury in all cases of crimes formerly tried otherwise in admiralty, and a "trial by an impartial jury," and by witnesses face to face. 1 Tr. Bl. 72, 73. And the legislation since (Bains v. The James & Catherine [Case No. 756]), from the start to the present moment, has corresponded by saying, in almost every crime committed on water, that to give the courts of the United States jurisdiction over them, they must, as by 15 Rich. II., be committed out of the body of a county, or, in other words, "out of the jurisdiction of any state." They do not except even those in great ships on the great rivers below the bridges, if within any part of a state.

It is doubtful whether many of the framers of the constitution thought of any criminal jurisdiction in extending judicial powers to cases in admiralty. It was "civil cases." It was those that belonged to commerce. It was a separate grant to define and punish piracies and felonies committed on the high seas, and probably thinking that power had not been embraced in giving authority over cases in admiralty.

When congress came to legislate about cases in admiralty, it did, in order to prevent any doubt, confer on the admiralty court jurisdiction over civil cases only. And it gave cognizance of crimes in admiralty neither to that court nor any other, as over crimes in admiralty, but gave cognizance of several specified offences to the district court, and of several to this court. It is most important to have as much as possible granted by congress under the power to regulate commerce, &c., rather than by admiralty merely, as in the last case no jury is allowed by the constitution, but in others one is, and the trial is also by the state laws, or those of congress, and not by a foreign code. The whole leaning of this court, therefore, in case of any doubt, should be towards obtaining jurisdiction over commercial questions or crimes against navigation and trade by special legislation of congress, rather than by broad constructions of any grants of mere admiralty power. Because there a jury can be used, under the power to regulate commerce. The only prominent attempt to revive here the ancient admiralty jurisdiction over crimes by construction, when committed on the water, within the jurisdiction of a state, has been in U. S. v. Coolidge [Case No. 14.857]. This has been overruled in [U. S. v. Coolidge], 1 Wheat. [14 U. S.] 415. Some others have been noticed as to revenue seizures and torts, in the case of the Waring v. Clarke, 5 How. [46 U. S.] 441. And though some have supposed that the word "maritime," added in the constitution after the word "admiralty," might be construed as extending the present meaning of the word "admiralty" (De Lovio v. Boit [Case No. 3,776]; 3 Story, Const. 527, and note to [M'Clung v. Ross] 5 Wheat. [18 U. S.] 113), yet it would seem to me to raise an implication that it was restrictive, and if any thing had got into admiralty which was not strictly maritime, or happening on the seas, (mare) it was not to be embraced, as the cases must be as admiralty and maritime jurisdiction, that is, of both, must be of things on the sea maritime as well as called admiralty. See, also [The Thomas Jefferson] 10 Wheat. [23 U. S.] 418, 429; [The Orleans v. Phoebus] 11 Pet. [36 U. S.] 175; Thackarey v. Farmer of Salem [Case No. 13,852]. At the utmost, "maritime" and "admiralty" courts are treated as the same, and the expression a plecnasm in Selden on Fleta, and Federalist, No. 8, p. 531. See, also, "Courts Maritime or Admiralty Courts," 3 Bl. Comm. 68, 106.

Again, in another view, the difference now is merely nominal between admiralty and maritime, since the admiralty court has ceased to be military. Stevens v. The Sandwich [Case No. 13,409], note. Hence maritime in the constitution may be to show that no military or naval power is granted in it, but only maritime; and thus, too, it is restrictive rather than enlarging. Now after all this, to suppose that our ancestors intended in any statute, like that of 1790 or 1789, unless their language was more clear and explicit to that effect, to grant a power to this court to try and punish every thing as an offence in particular places which was one in admiralty in England or on the Continent in the fourteenth century, though never since, or on the Continent in 1789, is presuming

against what was probable from the whole subject-matter, and the history of ourselves no less than our ancestors, both legal and political. Showing, then. that an act like this was prosecuted in admiralty in England, in the fourteenth century, is not enough to make it a crime now, unless such continued to be the law and usage there at the time of the adoption of our constitution.

The references have been very full by the counsel for the government to prove that the admiralty courts on the continent of Europe formerly, and in England before Richard II., exercised a power over such subjects. And it may not be disputable, that for a brief period, they did. if looking to the ancient commissions and inquisitions, and the usages in France and some parts of the Mediterranean. But the conflicts which quickly arose in respect to the exercise of this and other criminal jurisdiction by the admiralty court in England, led, as before seen, to the restraining statutes of 13 and 15 Rich. II. The struggle was afterwards only occasionally renewed, till it led to a still more restraining, and in some views, more important statute of 28 Hen. VIII., A. D. 1520, which took from the court of admiralty as such all important criminal jurisdiction, and devolved it on a commission, composed of judges at common law as well as in doctors' commons, and required all the trials of crimes to be by a jury. Hence, if congress, in the act of 1789, had expressly conferred on this court jurisdiction to try all criminal cases in admiralty as it did on the district court to try all civil ones, and had declared, that what was criminal by admiralty laws should be so considered and punished by this court, this would have made a stronger case. [U. S. v. Smith] 5 Wheat. [18 U. S.] 153. But still, doubt would exist, whether the acts of the respondents amounted to an offence in admiralty. Certainly they would not, if the correct test as to such an offence be what was understood to be one in England or here when the constitution was adopted, however little doubt might exist if we looked to what was a crime in admiralty before 13 and 15 Rich. II. in England, or since, on the continent of Europe. This will be seen in what has already been stated in respect to the boundary of admiralty jurisdiction, before and after those celebrated curbs on its encroachments.

But beyond this, to render it very improbable that many matters, before treated as crimes in admiralty, continued to be so treated, many will doubtless remember the long struggle between the court of admiralty and courts of common law in the thirteenth and fourteenth centuries, for jurisdiction over offences as well as civil cases, on navigable waters within the body of a county, and which led to the restraining statutes of Rich. II., and was one with many other quarrels, which terminated in the hanging of some of the judges on both sides. The Chief Justice Tresilian seems to have headed one party,

and Arundel. the lord high admiral, the other. 1 Henry, Hist. Eng. 258, 263; 1 Harg. St. Tr. 1.

After such a warning, the admiralty court would not be very likely to encroach again soon into the bodies of counties, and punish as crimes in admiralty there what the common law courts and parliament itself by the restraining statutes of Richard considered as offences to be tried only in the latter tribunals, and which it was afterwards made penal to prosecute in admiralty. Though some of the old commissions to the admirals may have retained their old forms, as to an inquiry into nuisances by seines and weirs for fishing, and rubbish, obstructing navigation, as quoted by Sir Lionel Jenkins and others. See Zouch, Adm. 92; Clerke, Prac. 99; 7th Article of the Practice of the Court of Admiralty, in the Black Book; Bract. p. 12, § 6; Spel. Relics Adm. 286; Constable's Case, 5 Coke, 106; 2 Hale, P. C. 11–20; Rich. I.; Edw. III.; Rich. II.; Hen. VIII. (Ruffhead's Ed. pp. 6, 260, 329, 424, 448); 2 Browne, Civ. & Adm. Law, 463, 465, 474. Yet in many cases the inquiries were limited to places below or beneath the lowest bridges. See before, and (Zouch, Adm. 92), usually "below" them, or only up to them from the sea (Lex Mercatoria, p. 88; 2 Hale, P. C. 18). They seldom if ever extended into the body of a county, unless sometimes on salt water when the tide was in. 2 Browne, Civ. & Adm. Law, 30; Bac. Abr. "Court of Admiralty"; Constable's Case. 5 Coke, 106. And the common law courts had concurrent jurisdiction as to those crimes in rivers. 2 Hale, P. C. 16, 54; 1 Starkie, 16. Or unless the collection of gravel or rubbish actually obstructed navigation or periled ships and life in great rivers in fresh or "sweet" waters towards the sea below the bridges (Clerke, Prac. p. 119); and this was all before 15 Rich. II., or violated that statute, if the rivers were in the body of the county. See Black Book Adm. c. 34, p. 109. See, also, the Inquisition of Queensboro', in Hall, Adm. Prac. 20, Pref. See the articles drawn up under James I., as to the power of the court of admiralty. Pref. of Hall, Adm. Prac. 24; 2 Browne, Civ. & Adm. Law, 79; 2 Hale, P. C. 16, 118; Dunl. Adm. Prac. 7. It is true that the Inquisition of Queensboro' was in Edward III. 49 (A. D. 1376.) Zouch, Adm. 34; 4 Partesue Col. 200. But this was before 15 Rich. II., and centuries before our Revolution. As before remarked, Sir Lionel Jenkins also attempted to revive the ancient jurisdiction, and in his charges went nearly as far as before Rich. II. He says, inquire of "all such as have cast ballast, rubbish or filth into our navigable rivers below the bridges next the sea," or stones for lighters to fasten to, and not laid a yard deep in the ground. so harbors not become "choaked up." Curtis, Adm. Dig. 341, Ap. 530, 532. Strictly speaking, he might mean to confine these inquiries to the sea and below bridges,

as he says, "all nuisances and abuses upon our salt waters and navigable rivers beneath those bridges which are next the sea" (page 540), and hence not like the present case. But if he did not mean to confine himself to the high seas, or to the era before Rich. II., as to offences, his views are a departure from express statutes and the actual jurisdiction exercised in admiralty as well as common law. [Ramsey v. Allegre] 12 Wheat. [25 U. S.] 635 (Johnson, J.). If he meant to go as far as the words in the ancient and obsolete forms of commissions, as shown in the Black Book of Admiralty, in Clerke's Practice, he meant to violate express acts of parliament, unless keeping below the bridges. The old inquest or inquiry run (article 14, Clerke, Prac. translated into Latin) into "alias causas quascunque super mare, et infra quoscunque rivos, aquas seu rivulos maris," but takes care to add, "usque ad primum pontem emergentes terminare." So in a note to the 14th article in felonies, "felonias spoliationes," the power run to sweet or fresh waters, "aquis dulcibus" as well as "super mare;" but it was only in them "ubi dominus magnus admirallus Angliæ habet aut habere consuevit auctoritatem sive jurisdictionem," i. e. below the first bridges in cases of murder and mayhem. The same attempt was made, by construction of old phrases and otherwise, to depart from the true limits of admiralty jurisdiction, that is, "the high seas," in Massachusetts, when a colony, and was resisted in a remonstrance by the house of representatives, in 1770, as first in the list of their grievances, and by a committee, of which John Hancock and Samuel Adams were members. "We have seen of late innumerable encroachments on our charter; courts of admiralty, extended from the high seas, where, by the compact in the charter, they are confined, to numberless important causes upon land;" followed by a list of other grievances. Mass. State Papers, p. 47.

The modern commission or patent to the judge of admiralty includes several things as of old, but not now by law in his power. 1 Hagg. Adm. 312. Indeed, a great part of the powers given by the terms of the commission are totally inoperative. Id. See, also, The Little Joe, Stew. Vice. Adm. 407. Again, by the resolutions of the judges (Feb. 4, 1632), an attempt was made to revive the ancient jurisdiction of the admiralty concerning obstructions in rivers. This was placed, not on any ground except to try mayhem and murders there in great vessels below the bridges, but as to the admiral, it was said, that "by exposition and equity thereof, he may inquire of and redress all annoyances and obstructions in those rivers that are an impediment to navigation or passage to or from the sea," and not be prohibited. See Dunl. Adm. Prac. 14; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 367, note; Hall, Adm. Prac. 24, 25, Pref. But beside this being probably below only, and not at or above the bridges, those resolutions were not laws, could not abrogate the laws, and were disavowed afterwards as assented to by several of the judges. Hall, Adm. Prac. 26, Pref.; T. Raym. 3; [Ramsay v. Allegre] 12 Wheat. [25 U. S.] 617; Clinton v. The Hannah [Case No. 2,898.] They do not appear ever in this respect to have been practised on. Bac. Abr. "Court of Admiralty, A." Again, this was an exception in a statute of only murder and mayhem in great ships; and it would be most extraordinary to consider an exception expressed, as a good reason for making other exceptions not expressed. On the contrary, the sound legal maxim is expressio unius est exclusio alterius. So of many other matters cited in old books as admiralty powers. They were such as are now obsolete since Rich. 11., and with the growth of cities and distribution of such powers among municipal officers and other courts. Thus, when an inquiry in admiralty was ordered as to the anchorage of vessels and their injury to each other in port (Zouch, Adm. p. 97), it related to a maritime matter, and was before Rich. II., and hence took place in admiralty. So as to the demeanor of seamen and ferrymen, and to repress their uncivil manners, it related to maritime men, and was previous to that statute. Zouch, Adm. 91; Lex Mercat. p. 77.

The admiral, at first, merely governed and punished seamen by a sort of naval rather than commercial code. After the navy was separated, and merely protected the mercantile marine, he continued to settle disputes as to matters happening any where on the sea flood, out of the body of counties, as the county magistrates and juries did not exist there, and it seemed to be the appropriate theatre of his power. 2 Browne, Civ. & Adm. Law, 30. Though restrained within the counties, he was powerful without, and the claim of the king to the four narrow seas, and his ancient admiralty jurisdiction over them, were never relaxed. They were beyond the corpus comitatus. See Selden's Right and Domain of the Sea, "Ownership of the Sea," 384; Hale, De Portibus Maris, pp. 85, 86. All nations were in them for a time made to "veil the bonnet." 2 Browne, Civ. & Adm. Law, 469, 470.

Shutting the admiralty court, then out of all criminal jurisdiction since 13 and 15 Rich. II., and certainly since Hen. VIII., in England, as to matters happening within a county, how could the framers of the constitution or the authors of the act of 1789 mean to use language broad enough to make the present case "cognizable" in admiralty, a case happening several miles within a county? I will not undertake to say, that some of the members of the supreme court, in the recent case [Waring v. Clarke] 5 How. [46 U. S.] 441, have not gone far enough to make the admiralty law, as existing in England in the most remote ages, and as on the continent in more modern times, the true rule for deciding what are or are not within

the jurisdiction of admiralty courts here in certain civil cases. The decision will speak for itself. But believing that a majority have not said so, if any of them mean so as to crimes, I do not feel justified in regarding as guides in this instance, any thing which was not deemed proper matter for admiralty cognizance in England at our Revolution, unless made so here by colonial changes or made so since by our constitution and acts of congress. See more fully on this, my dissenting opinion, and the cases there cited.

Look a moment to the facts in the present indictment. Though the acts complained of were committed on salt water, within the ebb and flow of the tide, and where the river was navigable, yet the obstruction is not below, but above, and at the bridge, and is within the body of the county. Where is the instance in England of treating one of the bridges on the great rivers as itself a nuisance, either since or before Rich. II.? But there is no doubt that such an act unauthorized, if an obstruction to navigation, whether by throwing in rubbish or timber, would be a nuisance at common law, and punishable not only there, but in most of the state courts for the trial of crimes and questions at law, rather than of equity or admiralty. See cases, post. As strong proof that the admiralty has not for many ·centuries punished any nuisances, all the cases reported of prosecutions for nuisances are either in common law courts or in the exchequer by a bill for an injunction. None are found in admiralty, though Sir Lionel Jenkins (1 Zouch, Adm. 88, 96) claimed the power in ports and navigable rivers. Com. Dig. "Admiralty, E." 13. But where is the case of its undisputed exercise in admiralty since Rich. II.? Where at the time of our Revolution? "The water, banks, &c., within ports and havens, are within the power of the commission of sewers." Com. Dig. "Navigation, D." Cal. 38. A penalty for throwing ballast into them is imposed by 19 Geo. II.. and is a fine collected before a magistrate and not in admiralty. Id.

The city of London has, by patent or grant, charge of the Thames, as well as the soil under it, and assesses taxes to repair wharves and remove rubbish. Calth. Cas. pp. 122, 123. We have, also, already shown, that the admiralty courts in England punished no misdemeanors when our Revolution took place; and that all their criminal jurisdiction was probably intended by the framers of the constitution to be parcelled out, and indeed conferred on congress, to grant to its courts under other heads, and not as mere admiralty offences.

But to consider that an offence in admiralty, which was committed within a port, within the fauces terræ, the promontories of it, within the jurisdiction of a state, within the body of a county, within the reach of state laws and the state courts, not on board a public ship, or in a fort or lighthouse, or navy-yard under the exclusive jurisdiction of the United States, not in any ship whatever; and yet, in this age or that of the framers of the constitution, to be regarded as clearly within the cognizance of an admiralty court merely as such, and having no aid from specific acts of congress otherwise reaching and punishing the act as injurious to commerce, or to some other subject like revenue or navigation, placed under its regulation and protection; that, I think, would be a pretty bold stride, whatever may have been the law in England at the time of the Crusades, or in the Mediterranean, where the pliable principles of the civil law, rather than those sturdy and jealous ones of the common law, predominate. Seeing all this difficulty as to what powers of admiralty, at what era and in what country, are in force here, and the doubts even in some civil cases not yet removed ([Waring v. Clarke] 5 How. [46 U. S.] 441), it is perhaps fortunate, that congress adopted a different course as to criminal cases, and instead of conferring all power over them in the gross on this or any other court. merely granted it in detail, in particular cases, from time to time, as the public exigencies and obvious expediency required congress to act. In this way congress did not disturb the colonial prejudices against such a broad jurisdiction in admiralty as we and our ancestors had for so many centuries been opposing, and especially in criminal matters. In this way, also, the prejudices in favor of trials in the common law courts, or courts acting on their law side, and on common law principles, and in common law forms, were acquiesced in, and left to the tribunals in each state, without any action on them by congress, or the offences specially defined by acts of congress, and the jurisdiction over them specially given to the circuit court, and given to it, not as a court of admiralty, but as a law court. In this way they avoided collision with the states, the state courts, state jealousies, state jurisdiction and state rights; selecting only for offences acts committed without state jurisdiction. or on the high seas, or in places expressly ceded to the United States.

Having shown, from this cursory view of the history of the curtailment of admiralty jurisdiction in England, that the construction claimed by the prosecution as to what is "cognizable under the authority of the United States," in the act of 1789, could not, on any fair grounds, be intended by its makers, as it thus would become necessary to ride back, and ride over all changes in admiralty since the beginning of the fourteenth century, and having shown that a transaction like this, an obstruction in any waters within a county, has not for centuries been deemed a crime cognizable in admiralty in England or in this country, however exceptionable and punishable it once was in admiralty. or may at times be now in the courts of common law, I might stop as to this. But it is very doubtful whether the place of this offence, even were the act

a crime in some places and cognizable in admiralty, was within the criminal jurisdiction of admiralty courts in England or here at the time of the Revolution. An act may be a crime in one place against admiralty law, which is not, if done in another place. This act was not done on the high seas, nor out of the body of a county, though within tide water. Locality in crimes, as in torts, has ever been considered the chief test of admiralty jurisdiction. The very acts of congress which punish crimes connected with maritime affairs, usually require in express terms, that they shall have been committed out "of the jurisdiction of a state;" but the bridge and the nuisance, if any in this case, are confessedly within the body of a county; and though over tide water, are not on the high seas, nor on a narrow arm of the sea or harbor without the boundaries of a county.

This question is in some aspects like the last, but in others is different, and fortifies it, because developing the local boundaries of all criminal jurisdiction in admiralty, whether for nuisances in public waters, or other offences to be without the locus in quo here. I shall, under this head, say nothing of the character and locality of this particular offence as charged in the indictment, except by showing, that all jurisdiction of all crimes in admiralty, with a single exception before named, was in England, both in 1776 and 1789, excluded from a place like this. The general rule is, that the admiralty jurisdiction in crimes, after 15 Rich. II., was only on the sea without the body of a county. Com. Dig. "Admiralty, E," 5, note; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 371; 2 Browne, Adm. & Civ. Law, 465, 475; Hall, Adm. Prac. 19; U. S. v. Grush [Case No. 15,268]. Super mare altum. Com. Dig. "Admiralty E." 1; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76; [Handly v. Anthony] Id. 379; [Kendall v. U. S.] 12 Wheat. [25 U. S.] 623, 627 (Johnson, J.); Hale, Hist. Com. Law, p. 35, c. 2; 3 Story, Comm. p. 534. That this included the sea thus situated, to high water mark, though some say only to low water mark. U. S. v. Kessler [Case No. 15,528]; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 336; 3 Inst. 113; U. S. v. Smith [Case No. 16,337]; U. S. v. Hamilton [Id. 15,290]; Steele v. Thacher [Id. 13,348]. See cases above. That it embraced even ports, havens, and creeks, if so situated without the county. Montgomery v. Henry, 1 Dall. [1 U. S.] 49. There they are considered "the high sea" or "main sea," and so also when without the capes. U. S. v. Grush [supra]; 3 Rob. Adm. 336; Harg. Law Tracts, 88. But they are usually infra corpus comitatus, within the fauces terrae, landlocked, and then admiralty criminal jurisdiction ceases, and, of course, that of the United States founded on it. [U. S. v. Coombs] 12 Pet. [37 U. S.] 72; Com. Dig. "Navigation, K." and "Admiralty, E." 5; 4 Inst. 148; The Harriet [Case No. 6,099]; 1 Bl. Comm. 110; [U. S.

v. Wiltberger] 5 Wheat. [18 U. S.] 99, 184; The Abby [Case No. 14]; 1 Hawk. P. C. c. 37, § 36; U. S. v. Grush [Case No. 15,268]; U. S. v. Robinson [Id. 16,176]; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 336. To show the application of this to the present facts, this is the law in the river Thames. Com. Dig. "Admiralty, F." 2; 4 Inst. 139; 1 Rolle, Abr. 539. And in other rivers, however salt or strong their tides [U. S. v. Bevans] 3 Wheat. [16 U. S.] 94. So in most roadsteads. 1 Rob. Adm. 233. But not so in an open roadstead in a foreign country. [U. S. v. Pirates] 5 Wheat. [18 U. S.] 200; The Liverpool Packet [Case No. 8,406], U. S. v. Ross [Id. 16,196]; U. S. v. Davis [Id. 14,932]. So an "arm of the sea"·may be within a county as the mouths of many rivers are regarded in England. U. S. v. Grush [supra]. So most creeks are within the county. 10 Price, 401; Hale, De Port. Mar. 46–48. Hence a creek is said not to be a port or haven, or to have this privilege. Com. Dig. "Navigation, C."; Bac. Abr. "Courts of Admiralty." Certainly not, if fresh water or within the county. [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76, note. And it is hence, as hereafter explained, probably, that in the Blackbird Creek Case. Chief Justice Marshall says nothing of the dam across it violating the rights to go to any port of delivery, or to sail upwards to the highest ports. See post. The acts of congress concerning the fisheries, give a bounty when "employed at sea for the term of four months," and this has been construed to mean out of the ports and harbors of the seacoast. The Harriet [Case No. 6,099]. The space between capes of the main sea, or high seas, or ocean, is usually so wide, that one cannot see what is done across, and the coroner, sheriff or people not be able to see and know an act done. Ang. Tide Waters, Pref. xiii., and cases. ·In cases of doubt, the county acts, more especially if it has been the usage for it to act there. 2 East, P. C. 804; 6 Dane, Abr. 341, 346; 1 Com. Dig. "Admiralty, F." 2; Ang. Tide Waters, 300, 301; 4 Inst. 140. Such cases must arise often, as the state of the air would make a great difference as to the distance things could be seen distinctly. The Arabs in the north of Africa consider it a mile, when so far as not to be able to distinguish a man from a woman. The punishment of crimes, without such limits, congress may impart to such courts as are thought most proper. 4 Elliot, Deb. 290, 291; 1 Kent, Comm. 319; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 356, arg. So if a crime be committed on the high seas, but in a foreign vessel, we have no jurisdiction of it. A gun fired, and killing, the act is done where the vessel is, on board of which occurs the killing. U. S. v. Davis [Case No. 14,932]; 1 Leach, Club. Cas. 432. That may be on the high seas, if outside, and the vessel is afloat, though the ground is bare there at low tide. If in a foreign vessel, we have no jurisdiction. U. S. v. Davis [Case No. 14,932].

It is, pro tanto, foreign territory. U. S. v. The Pirates, 5 Wheat. [18 U. S.] 197; U. S. v. Kessler [Case No. 15,528].

Piracy being an offence against the law of nations, as well as our own laws, may be punished here wherever committed, on the sea, if not in a vessel of some foreign power. U. S. v. Klintock, 5 Wheat. [18 U. S.] 152. A revolt, under the statute of April 30, 1790, need not be on the high seas, as the statute does not say in this crime it must be out of the jurisdiction of the state, or on the high seas, but only in some ship. U. S. v. Hamilton [Case No. 15,291]; 1 Bro. Laws, 113. But congress makes this a crime within the body of a county, not by its power over admiralty matters, as those matters in crimes do not arise within the county. It is rather by its power to regulate commerce, and punish offences committed in the prosecution of it and in vessels. This may be done on land as well as water in several cases, as congress governs the commerce between the states, often wholly on land. [Brown v. State of Maryland] 12 Wheat. [25 U. S.] 446. The revised act of March 3, 1835, punishes a revolt, if "on the high seas, and in their admiralty jurisdiction," but does not say, out of the limit of a county. 4 Bro. Laws, 776. Hence its meaning in this respect is to be settled, though in other cases the high seas have been held to be the unenclosed ocean. See before, U. S. v. Grush [Case No. 15,268]. Confining a captain on board an American ship, if in port, is punishable. U. S. v. Stevens [Case No. 16,394]. Yet it is not an admiralty case, but one under the power to regulate commerce.

I should have much confidence in this view as to the locality of crimes, in order to give admiralty jurisdiction over them; and that this indictment must fail on this account alone, if on no others, had it not been equally strong as to a like locality of maritime torts being necessary to give admiralty jurisdiction over them; and the supreme court recently, in [Waring v. Clarke] 5 How. [46 U. S.] 441, held that locality in the latter to confer such jurisdiction, need not be on the ocean or outside of a county. They held it might be any where on tide water, though two hundred miles in the interior of a state, and in the centre of one of its counties. To be sure, the decision is carefully confined to the case of collision between vessels, and does not in terms extend to other torts, or to contracts or crimes. But I must confess that my opinion is weakened in respect to this ground concerning crimes. And I abandon all analogies, which had before been relied on by me, on account of a like rule in torts generally. The cases in respect to them may be seen, however, in [Waring v. Clarke] 5 How. [46 U. S.] 441, collected in the dissenting opinion. So also may be seen there the reply as to any contrary reasoning or analogy derived from the locality of contracts, and of cases of seizures for breaches of the laws of revenue and trade on the water.

In other matters more than crimes, connected with admiralty jurisdiction, it may be important at times to discriminate between the sea and the high sea, a river navigable and not navigable, whether the tide ebbs and flows at a particular place or not, and whether jurisdiction does not extend for some purposes to other than our own vessels, beyond the seashore. But I apprehend, that in crimes, "the seas," or "the high seas," or "the ocean," mean much the same (6 Dane, Abr. 348), and that in other matters "the ebb and flow of tide," "the flood mark," or "the sea flood," were often much the same, though not always (De Lovio v. Boit [Case No. 3,776]). So when it becomes material to decide what is navigable or not, as in the act for revenue seizures on streams navigable from the sea by boats of ten tons burthen, the act of congress in this way itself virtually defines what is meant by the term navigable for that purpose. There may be many places, also, where the tide ebbs and flows, which are not navigable (Mayor of Lynn v. Turner, Cowp. 86); or if navigable, are not public (Id.; 5 Taunt. 86). They may be not public, though the tide ebbs and flows, if made navigable by expense of the owners, and the use by them has been exclusive. Miles v. Rose, Id. 705. But I shall not go into this inquiry, though an interesting one, it not being necessary to dispose of the present motion. Some of the leading cases on it are, Hooker v. Cummings, 20 Johns. 98; People v. Platt, 17 Johns. 195; 3 Caines, 319; 2 Conn. 481; 4 Burrows, 2162; Dav. Ir. K. B. 55; Ang. Tide Waters, 63, 91; Rex v. Smith, 2 Doug. 441; The Planter, 7 Pet. [32 U. S.] 343.

So, looking to foreigners and other purposes, the territorial limits of the United States extend a marine league from shore, a cannon shot. Vatt. Law Nat. bk. 1, c. 21; [Grant v. Naylor] 4 Cranch [8 U. S.] 234; Church v. Hubard, 2 Cranch [6 U. S.] 187, 234; The Ann [Case No. 397]; [U. S. v. Palmer] 3 Wheat. [16 U. S.] 630; Acts 1798, 1820; U. S. v. Kessler [Case No. 15,528]; Ang. Tide Waters, Pref. xii. Sometimes further it is said (U. S. v. Kessler [supra]) to keep foreigners from fighting and smuggling. The Apollo, 9 Wheat. [22 U. S.] 370; [U. S. v. Pirates] 5 Wheat. [18 U. S.] 201; Append. 123. But the details on this are not material to the present inquiries, and will not be pursued. The leading views on them may be seen in Soult v. L'Africaine [Case No. 13,179]; Jennings v. Carson's Ex'rs [Id. 7,281], note; 1 Azuni, Mar. Law, 195; 8 Geo. I. c. 12; 3 Hagg. Adm. 289.

A provision, making acts like those of the respondents a crime, and entrusting the trial of them to this court, not being found in the act of congress of 1789, in express words, nor the power being embraced in or under it,

by any clear reference to any admiralty code of any age or people, as meant to be adopted by it, nor being likely to be meant as included, from its vagueness, and the exclusion of an offence like this within a county, from the English admiralty code since Rich. II., and admiralty jurisdiction over offences generally not reaching a place like this in England, either in 1776 or 1789, it may next be asked, if this matter was acted on in admiralty in this country, while we were colonies, and has thus, by any implication connected with the act of 1789 and the constitution, become a crime? It seems to be contended, and perhaps ought to be conceded, that if the admiralty code in England had been departed from here, by any voluntary law, or general and uniform usage in this or other matters freely adopted, so as to be likely to be well known and recognized, at the time the constitution was adopted, such modification might be supposed to be adopted by implication. But such an usage on any point in any one of the thirteen colonies, not recognized or acted on in the residue of the thirteen, could not be regarded as thus operating in the minds of the framers of the constitution. This matter, however, has in all its ramifications been examined by me, so far as any means exist in relation to our colonial history, colonial reports, and colonial statutes, in the case of [Waring v. Clarke] 5 How. [46 U. S.] 441. And it will be only necessary to refer to these here, and to say, that in my opinion, notwithstanding the broadness of commissions, copied from old and obsolete forms, the doings under them prove clearly a very close conformity by the vice admiralty courts in the British colonies to the admiralty jurisdiction and principles at home, except where in one or two instances altered by express acts of parliament to harass and oppress them. And if the feelings prevalent here before the Revolution in respect to admiralty powers are evidence of what was meant in the constitution by "cases in admiralty," or in subsequent acts of congress, no doubt can exist, that a restriction rather than enlargement beyond the English practice, even as then existing, was desired, and the trial by jury meant to be more widely secured.

There is not a more striking illustration, that Massachusetts refused to tolerate or approve any of the enlargements and encroachments of admiralty jurisdiction, which in some respects were forced on them while colonies, by statutes at home, than the indignant remonstrances she so often put forth on the subject, emanating from some of her most intelligent patriots. See one specimen before given. This view would not prevent congress, under its power to regulate commerce, and allowing a trial by jury if desired, expressly to invest the district court or this court with jurisdiction over both torts and crimes within the body of a county on tide waters, as it has already invested it with jurisdiction in cases of seizures for breaches of the laws of trade and revenue. But this was never possessed in England by the court of admiralty. It belonged there, to the exchequer, and was made an appurtenant here to the admiralty, both before and since the Revolution, because no court of exchequer existed here, and not because it ever was or ever can be in its nature an admiralty power, when the seizure is not only above the ocean and above tide water, but as far into the interior as a boat of ten tons burthen can be floated. See [Waring v. Clarke] 5 How. [46 U. S.] 441. In a like manner, congress, under that power to regulate commerce, has conferred on the district court jurisdiction over maritime matters on the tideless lakes in our interior, but not as belonging to it by means of its admiralty jurisdiction, else this specific grant would have been unnecessary, the court before having cognizance of all civil cases in admiralty, and else the allowance given of a trial by jury would not have been in symmetry. And how much better it is that new powers should thus be conferred and doubtful ones invested in it with certainty, than to force them within it by construction only of grants not specifically embracing them, will be strikingly manifest, when if thus expressly conferred, the inestimable trial by jury exists, and the principles of evidence applied may generally be those of the common law; while in the other grant no trial by jury is allowed, certainly none in civil cases, and they are tried by a different code of law and evidence from what we and our fathers have been much accustomed. Many things look now as if belonging to the admiralty jurisdiction, which do not in modern times belong to it here or in England. Such are lighthouses. But they were granted to the Trinity House, and placed in their charge as early as Hen. VIII. Bac. Abr. "Court of Admiralty." So buoys and beacons, once in charge of the admiralty (1 Sid. 158), have not been of late, except by a patent or grant from parliament. And who ever dreamed here, that the expenditure of the vast sums which have been appropriated in this country for the improvements of rivers and harbors, and the removal of snags, and sawyers, and sand-bars, belonging to the care of the district courts as courts of admiralty in all civil cases? On the contrary, here and in England these have ever been matters of special legislation and general supervision, entirely under other legislative powers. McCulloch's Dict. "Buoys and Beacons." Though lighthouses and beacons have at times, under a special patent, been erected by the admiralty, the duties collected on them and the charge of them belonged to the Trinity House, long before the Revolution. See 8 Eliz.; 4 Inst. 149; Com. Dig. "Navigation, H. Beacon and T." 3.

The powers exercised here by the general government over commerce, and matters and waters connected with it, are not all of admiralty origin and character, but much wider.

So when congress erects lighthouses, and builds breakwaters and a navy, and goes far beyond the admiralty in England at the Revolution, in removing snags and sand-bars, and making moles and piers, and marine hospitals. Bac. Abr. "Court of Admiralty, B." Many of the offences connected with these are new and not of admiralty origin, and are within capes and headlands, and some within the body of counties, and on the land. In truth, with the power to regulate commerce, and carry on our foreign relations, and build forts, and navy-yards, and lighthouses, maintain a navy, &c., a code of criminal law has grown up connected with these powers and for their protection, which belongs to the whole matter, and not to admiralty alone. See post.

What they then were in England, and since have been till 1776 or 1789, are the guides as to what must now be understood as the extent of the criminal jurisdiction meant to be allowed to congress to confer on the courts of the United States, as mere admiralty powers, or as being, per se, admiralty powers. The learning and labor of the counsel for the government, as to earlier periods, have been interesting, and shed much light on the antiquity of different kinds of admiralty power. But the practices in such remote ages, and under governments so different from that of England, cannot control the present case, under the laws as existing when the constitution was adopted, with the modifications and additions since made by acts of congress. And as the growth of the country is developed, and national exigencies arise, the further exercise of its just powers will often be called for, entirely independent of any grants of admiralty jurisdiction, and leaving more and more doubtful what parts, if any, as to crimes, were ever meant to rest merely on those grants. Stanly v. Bank of North America, 4 Dall. [4 U. S.] 10, note. It is by no means certain, if the grant of admiralty jurisdiction had been omitted entirely in the constitution, that the other grants to regulate commerce, maintain a navy, declare war, and collect a revenue from imposts, and establish courts, &c., would not have enabled it to confer on those courts all the criminal jurisdiction, if not the civil, which they now possess, connected with maritime affairs. The admiralty code of criminal law was also one in some respects too bloody for us and this age, as for example, death to remove a buoy. Curt. Adm. Dig. 544; Jenkins' Works.

As the ground has been taken I shall next proceed to inquire briefly, if the acts complained of in this indictment are made punishable by the force of any other act of congress than that of 1789, either directly or by construction. In examining any other acts, we are met not only by the presumption, that congress would not mean to do indirectly or circuitously what ample reasons showed they would be inclined to do directly, and which they did not do directly, but by the impropriety of holding that to be an offence, and prosecuting it as such, which is so only by construction, or inference, or implication. The act chiefly relied on, as being violated indirectly by this obstruction, and rendering it illegal, is that making New Bedford a port of entry. See it in 1 Stat. 629. It is made to "include all the waters and shores within the towns of New Bedford, Dartmouth," &c. This bridge is within the limits of that port, as a "port" would usually be defined, i. e. the waters within the gate, or door, or outlet towards the sea. This port is allowed by congress to be a place for shipping produce to foreign countries or other domestic ports, and for introducing merchandise from abroad for home consumption. It is an encroachment on it to place bridges across it without draws sufficiently wide for all vessels to pass and repass, or to throw stone and gravel into its bed so as to make parts of the channel too shoal for navigation. It is a very important port, possessing over one hundred thousand tons of shipping, equal in that respect to any in England or America except four in each of them, and superior to any whatever in France. Its freedom from improper obstructions ought, therefore, to be carefully watched over and preserved. And it is contended, that any encroachment on it, or violation of the rights existing, when it was made a port of entry, ought to be considered a crime or misdemeanor. But supposing that it should be, can it be considered as made a crime or offence by this act of congress? This act merely allows exports and imports there, but does not punish any obstruction in its waters. In England, many important and exclusive privileges have been conferred on certain ports, as the Cinque ports, and the ports of London and Hull. But here, no preference can, by the constitution, be given to one port over another (article 1, § 9); and whatever power properly belongs to congress in regulating commerce and establishing ports of entry and delivery, to protect them by penalties from encroachments and obstructions by wharves, buildings and bridges, it is in this case sufficient to say that congress has not yet exercised that power. But if wharves or bridges are so made as to obstruct a port or any navigable waters, they are undoubtedly illegal under the laws of Massachusetts, unless authorized by the city, or state, or general government, which may possess authority over this matter. Whether illegal, so as to constitute a crime, or only a civil wrong, must depend on the laws of the government possessing jurisdiction over the place and subject. If made a crime by that government, they may be criminally prosecuted as the laws shall specify, in those courts having jurisdiction over the place and subject. The state of

Massachusetts possesses the jurisdiction over this place for many purposes, though navigable water, as before shown; and can and would punish an obstruction as a nuisance in a highway. if she had not herself authorized it. Such bridges and wharves, when built out of the territory over which congress exercises exclusive legislation, such as the District of Columbia, are erected by state authority, and regulated entirely by state laws, or are constructed at individual pleasure and responsibility. They are, as here, within the limits of the state, and one of its counties; and though in regulating commerce congress might probably make laws, which would render penal any obstructions to foreign navigation, whether placed there with or without state permission, yet till congress do this, can such an obstruction be said to violate this act of congress, merely creating the port of New Bedford into a port of entry? Much more, can it be a crime under that act? The officers of such a port are usually state officers; its warden, its health officers, its harbor masters. The general government usually places no person there except for purposes of revenue, such as the collector, and his subordinates. If there be light-houses or forts near, then there are other officers, in connection with them, rather than the port as a port.

In ancient times, when some harbors or ports were secured by chains, and the chain master or master of the key, opened it for vessels to pass, and collected revenue or tolls, he may have had authority to look into and prosecute such matters; and in France, he was required to report offences of this kind to the admiralty. French Laws, bk. 4, tit. 2. See Laws, 254–257, 340. Though in some instances he was appointed probably by the city authorities, rather than by the central government or the admiralty. Such is the case here, usually, as before remarked. as to wardens of ports, harbor masters, &c. Those who commanded the forts at the entrance, as well as the navy for defending the port, were public officers of the government, but they never had, and cannot here have, any concern with the domestic or civil police and erection of bridges and wharves within the harbor. It is difficult then to hold, that by the express words of the act creating the port of New Bedford to be a port of entry, or by implication from analogies and usages elsewhere, that the punishment of obstructions, like this bridge, belongs to the general government or any of its officers. On the contrary, it belongs usually to the local authorities, and though congress may be authorized under the constitution to regulate and punish them, yet till done by specific laws for that purpose, its courts cannot regard such acts as an offence against the United States, however they may be in some cases crimes and private injuries under the state or local laws.

The free ingress and egress of our people to all ports of entry in the Union; the obstructing navigation in one of them, and especially one so important as New Bedford, is not to be countenanced when done by individuals without authority, and could effectually be punished as nuisance in the state courts. Nor can it be shut up in part, or entirely, as the port of Boston was by the Boston port bill before the Revolution, without working inequality and partiality, whether it be done by a license or order from the state, or the United States, and by force of a law, or by rocks, wood, or chains across its mouth, by individual and private speculation. And if a wrong or injustice has been perpetrated, under color of law, and cannot be prosecuted in the state courts while that law remains in full force, and cannot be redressed as a crime in the United States' courts, till some further legislation occurs defining or declaring it to be a crime, and empowering them to try it, yet it is a misfortune, which might soon be obviated by congress, and one which now might perhaps, as will soon be examined further, be relieved against in a civil remedy by damages to the person aggrieved specially by it, so as at an early day to correct the evil, provided this conduct delays, or interrupts, or injures the navigation of the country. See post.

But it is next contended, that if no jurisdiction over the matter is obtained by the act, making this port a port of entry, it is conferred by force of the acts appointing custom-house officers there and collecting revenue. See section 2, Act March 2, 1799, c. 22 (1 Stat. 627). The like reasoning applies to this position as to that concerning the port as a port of entry, except that the officers to collect the revenue are officers of the general government, and the revenue also belongs to that government. All which they are authorized to do, may, therefore, be connected with the federal power and federal supervision, and any obstruction to their rightful acts may be an offence punishable. in the federal courts. Such is the course of some of the laws on this subject, and such have been the decisions where such specific laws have existed, but not without. Here, however, no clause in any of them is pointed out, which make obstructions like these a violation of any revenue law. It is true, that the tendency of such obstructions may be to lessen the amount of business and revenue at New Bedford, but it will increase them probably at other ports, to which business may be thus diverted, and hence not injure the revenue of the country as a whole.

So, it is argued that the "Force Bill," as it has been called, conferred larger powers on custom-house officers to remove custom-houses when the collection of revenue at them was obstructed, and gave to this court wider jurisdiction to punish them. But it was only where the obstructions were not to

the navigation by stone, or gravel, or timber, but by the interference of the state authorities, or of unauthorized individuals, to prevent the entry of foreign merchandize, and the payment of duties thereon. That law was passed March 2, 1833 (4 Stat. 999). It was passed entirely diverso intuitu as all know, who were actors in those scenes, and never contemplated the punishment of obstructions like these. It was against "unlawful obstructions, combinations or assemblages of persons" (section 1). The additional jurisdiction there given to the circuit court, was to try in civil cases persons guilty of such assemblages, and injuries by them (section 2), and to try offences against the revenue laws, where jurisdiction has not been already conferred. This was all. The act authorizing coasting licenses, and for regulating the same, is also supposed to be violated by this obstruction. See the act of February 18, 1793 (1 Stat. 305), and March 2, 1819 (3 Stat. 493). It is certain that this act was meant to empower such vessels to go and trade in all the navigable waters of the United States, and on its coasts, and that any prevention of this would violate the spirit of those acts. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 1. It speaks of the going on "seacoasts" and "navigable rivers." Hence in the case of Gibbons v. Ogden 9 Wheat. [22 U. S.] 1. was held, that a law of New York, excluding steam-boats with such licenses from navigating the Hudson river, or giving an exclusive right to certain boats to do it, was deemed unconstitutional and void. And for aught I see, an obstruction placed in navigable waters by an individual, without constitutional authority, would violate such license, and be a ground for civil redress in damages. It disturbs navigation, and navigation is one branch of commerce, and a law of congress covering it, is thus violated. See [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 1. It is, perhaps, this idea in connection with the right which belongs to vessels to go to ports of entry and delivery, unimpeded and undelayed, that the counsel in People v. Rensselaer & S. R. Co., 15 Wend. 113, 121, conceded that a bridge, though with a draw, if below a port of entry, was unconstitutional. If so at all, it must be because it restricts and curtails, in some degree, the full privileges of licensed and registered vessels to egress and ingress, as to all parts of such ports in the pursuit of their lawful business. It also violates the rights before alluded to, by some of our treaties, given to foreigners to visit such ports, and these considerations may confer a power on the general government to remove obstructions below such ports that do not exist above. See the Maysville road veto. I do not understand the court, in 15 Wendell, to hold that any bridge at or above a port of entry like New Bedford, with a draw in it, is unconstitutional, if only somewhat incommoding navigation, but only when it

stops or cuts off some of it entirely (page 132). New York v. Miln 11 Pet. [36 U. S.] 102. But the same difficulty exists here as in the other acts of congress, in regarding the obstruction as a crime against the United States, without some clause in the constitution or in an act of congress declaring it to be one.

The acts complained of in the indictment, being then authorized by the state, and hence not a crime under its laws, the states having power to authorize them till conflicting with some provision in the constitution, or a treaty, or an act of congress, and there being no such conflict with any, that makes these acts a crime, or confers power on this court to punish it, the conclusion follows, that we have no jurisdiction to sustain the indictment. I am strengthened in this conclusion, till congress legislate further, by the consideration, that even now any individual, suffering by this obstruction in his rights to free navigation, is not probably without redress. The power then in the state of Massachusetts to incorporate the New Bedford bridge with a draw to allow vessels to pass, existed in 1795; and this exercise of it violates no prohibition in the federal constitution, no treaty, and no act of congress enforcing the granted powers under it to the general government, unless it be that giving coasting licenses. It violates that, perhaps, only as to vessels which from their size cannot pass through the draw, or as high up the harbor, from deposits, as they used to; and the owners of such, when actually obstructed and delayed by means of this bridge, might probably have redress in damages, or by way of injunction against it in chancery. Spooner v. McConnell [Case No 13,245]; People v. Rensselaer & S. R. Co. 15 Wend. 113, 135. But even they could not prosecute the bridge as for a crime, in the federal courts, when no clause in the federal constitution or the acts of congress declare such an obstruction to be a crime. No prosecution for a crime can now be sustained any where, even in the state court, for reasons already given, unless the act of incorporation to the defendants should be held void by those courts, as trenching on the powers of the general government, or on the rights of coasters under acts of congress. How that might be, they must decide for themselves, when appealed to. Civil redress, however, in the cases before described, seems obtainable in the courts both of the states and United States, notwithstanding the decision in [Foster v. Neilson] 2 Pet. [27 U. S.] 253, as there, it does not appear that any port of entry existed above, and here it does; and that the stoppage of some navigation to some parts of it is as entire as the state prohibition in Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, 221. We may say with Chief Justice Holt, when we agree that one hath a right, "if so, then they must have some remedy to come at it" (Rex v. Hornby, 5

Mod. 57; 1 Term R. 512; 2 Ld. Raym. 953); ubi jus ibi remedium. And the "judicial powers should be coextensive with the legislation, so far at least as they are to be enforced by judicial proceedings." Kendall v. U. S., 12 Pet. [37 U. S.] 527. But the question of a right is first to be settled, and then where the remedy is to be sought. At law; or in equity; before courts martial; or in admiralty; or before the legislature; and in state courts and legislatures, or in the United States? Though there is then no part of the constitution, or treaties, or acts of congress appearing on their face to make such an obstruction a crime, there is no necessity to give a forced construction to bring the case within those acts in order to punish it, there being full redress without doing this, to such individuals as specially suffer by it.

We have already shown, that in the absence of legislation by congress, making acts crimes, which may be within some of the constitutional grants of power to congress, such as the regulation of commerce and cases in admiralty, the states possess concurrent or subordinate authority over such matters, till the paramount action by congress takes place, if it choose to make the acts crimes, but if not, then to give civil redress, if the acts be contrary to its own laws or those of the United States. The establishment of courts of the United States did not in many cases divest the state courts of any jurisdiction before exercised. It would seldom do it, unless on matters vested exclusively in the general government as crimes against it, or in its jurisdiction, and forbidden to the states. See Federalist, No. 82. And it is every day's practice for a citizen, though able to sue in the federal courts, to prosecute his rights in the state courts. For some acts on navigable waters, redress may be had in either. Corfield v. Coryell, supra. Congress, in the act of February, 1838, granting admiralty jurisdiction over the lakes, specially reserved all concurrent rights in state courts and at common law. See before. In Alabama, their supreme court has entertained a libel against a steam-boat for wages. 9 Port. 112, 181. Yet the better opinion seems to be, that when an exclusive power like that in admiralty is conferred on the courts of the United States, no concurrent remedy, except a common law one, exists in the state courts. 3 Story, Const. 534, 553, note. See, also, 1 Kent, Comm. 351, 377, note; Rawle, Const. 202; American Ins. Co. v. Canter, 1 Pet. [26 U. S.] 512, 546; [Martin v. Hunter] 1 Wheat. [14 U. S.] 337; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 246, 312, 313; The Chusan [Case No. 2,717].

I have added several cases connected with this question, without stopping to enter into the consideration of their bearing in detail. If the act of incorporation in this case should be held void, as contrary to some act of congress, it is obvious, that then both the old civil and criminal remedies might exist in the state courts, for such an obstruction of navigable waters, but only a civil remedy in this court, from the want of some law making the obstruction a crime against the United States, and punishable in this court.

The objection against treating as a crime what has not been made so by any clause in the constitution or an act of congress, does not apply to a civil suit. For by the 34th section of the judiciary act, private rights and civil remedies are to be governed by the laws of the states, if none exist of the United States, even when tried in the federal courts, in cases where the latter have jurisdiction over the question and the parties. See before. And though that could not be deemed a private wrong or civil injury, any more than a crime, which a state law authorized, in conformity to its constitution and that of the United States, yet it might be considered criminal under the state laws, as to highways and nuisances, if considering the act of incorporation under which it was done, as unconstitutional, it being then in conflict with some power or law of congress, and might be open to a civil action in the federal courts, as being illegal both under such state laws as are valid, and also by the laws of the United States.

In the course of the argument it has been asked, if a state can with impunity levy and collect duties on tonnage and imposts, or forbid entries of vessels into a port? The reply is now obvious, that it cannot; and any such act by a state, conflicting with any rights under existing acts of congress, would be actionable, and civil redress be had in this court, and civil if not criminal in the state courts. Such virtually was the case of Gibbons v. Ogden. States may continue to use old and concurrent powers on these matters till congress legislate on them, when the states must yield. McCulloch v. State of Maryland, 4 Wheat. [17 U. S.] 316; [U. S. v. Gratiot] 14 Pet. [39 U. S.] 535; Commissioners of Erie v. Dobbins, 16 Pet. [41 U. S.] 435. There is little doubt, that laws enough now exist to protect in this court, by appropriate civil suits, all the rights and interests of the United States in any lands within them, or any personal property, or any easements on land or water, or any franchises. So they can try the rights of others in these, where the parties reside, so as to give us jurisdiction in that respect. Full civil jurisdiction to that extent is conferred by the 34th section of the judiciary act, before quoted. On the civil remedies and rights of this character, in such cases, in behalf of the United States, this court has recently given its views at length in U. S. v. Ames [Case No. 14,441]. But no law or section confers on this court all jurisdiction in such cases to punish acts considered as crimes by the admiralty, or maritime laws, or by common law; nor is there any such section or act, that makes an obstruction in navigable waters, a nuisance or

other crime, and gives jurisdiction over it to this court.

The 34th section of the judiciary act has been thought by some to be broad enough to give relief here. It is: "That the laws of the several states, except where the constitution, treaties, or statutes of the United States, shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply." It might be inferred by some from the face of this, that we could get from the state laws some common law jurisdiction and principles, if not statute law, to give us authority to punish in this case. Dup. Jur. 43, 44. But there are several objections to that view. We must first obtain jurisdiction by the constitution or acts of congress over a crime or civil suit, before we can apply in the trial the laws, statute or common, of a state. The Orleans v. Phœbus, 11 Pet. [36 U. S.] 175; The Planter, 7 Pet. [32 U. S.] 324, 337. And that jurisdiction we have not yet got, as yet ascertained over this as a crime.

In the next place, after getting jurisdiction, the application of the state laws to the trial of the case is only where it is a civil and not a criminal case. 2 Burr. Tr. p. 180, Append. Otherwise the court might entertain jurisdiction over most of the crimes in most of the states in the Union. 1 Kent, Comm. 398. Cases in chancery are in doubt also in this respect whether the state laws can be applied in equity trials by this court, as they and the practice in them rest on general principles of the civil law and usage in England, applicable here, and are not "trials at common law." See Rhode Island v. Massachusetts, 12 Pet. [37 U. S.] 657, 697. And finally, if the state laws, after we got jurisdiction, were to govern in the trial, they would prevent our punishment of this act complained of, though open to be done usually. For here it has been authorized by the state in incorporating the respondents, and allowing them to erect this bridge, and must be conformed to, unless the measures of the state and of the respondents under them are void for repugnancy to some act of congress.

Under these doubts as to the validity of the various grounds urged in support of this indictment, I feel compelled to dismiss it. In all questionable cases in courts like this, of limited jurisdiction, instead of leaving so much to construction by courts, and leaving so many uncertainties and conflicts, both in civil and criminal cases in admiralty, it seems to me wise for congress to legislate freely, as difficulties may appear, regulating the future, and removing that vagueness as to the law, which is so great a curse to the community. As the country increases in wealth and population, and the interior commerce and travel may outgrow its foreign and preponderate in the state legislatures, and lead to bridges for turnpikes, or viaducts for rail-roads, and aqueducts for canals, obstructing seriously the navigation of our great rivers and arms of the sea, and, as in this case, not requiring draws suitable to the dimensions and passage of modern steam vessels, it may become necessary for congress to exercise more of its powers to regulate commerce. It may be proper to protect the foreign trade and that between state and state by water, against inroads upon its freedom by those, looking more to land travel and land freights. And though obstructions in navigable waters by state authority or without, may injure some of the towns and some of the business of that state more than the business of other portions of the Union, or of alien friends trading here, yet other portions and other business of the state may reap more than a proportional benefit, and hence, as a state measure, it may on the whole be useful. But when looking at its influence on other parts of the Union and their citizens, who trade thither only by water, and treating it, as must be done under the government of the Union, as a national matter, and its influence as on the whole nation, it may be an unmitigated and uncompensated evil to many other states, and in respect to some alien friends under treaties, be a measure wholly unjustifiable. In such case, on looking to such events, and in the rapid multiplication of such bridges and obstructions, it may become necessary for congress to wake up more of its dormant powers to regulate commerce, and provide relief and redress, criminal and civil, in all cases of this kind clearly within its authority, and clearly requiring punishment or redress. I should be one of the last to desire to see such legislation take place prematurely or hastily, or at first with severity, as the subject is one possessing much delicacy, and many ramifications of deep interest. But it is more and more exciting public attention; and an era is approaching, if not come, when the general powers of the central government for the whole on matters connected with the interests of the whole, may be called for to protect private rights and remote privileges, and overcome local combinations of wealth and influence, seeking their own profit rather than looking to national duties and rights in respect to others; and, likewise, to correct errors of state legislatures in granting unlimited powers as to time to keep up a bridge over a navigable river, which by a change of business may have become a great public evil; or limited and unchangeable powers as to time, and the width of a draw for vessels to pass, which last, by an unexpected change in the size of vessels, has become useless, and a total obstruction to that class of ships; or powers, supposed not injurious to the river below, or at the bridge for navigation, but which have unexpectedly been followed by accumulations of sand and mud, obstructing most seriously and permanently the whole commerce of a large river.

In some cases, the legislation of congress

might not require the bridge itself to be removed, but only draws widened, so as not to damage the commerce between states or abroad, if the states themselves cannot and will not correct them by legislation or otherwise. In some cases it might require the obstructions collected in deposits of stone, gravel or mud, to be removed; and in others, the whole bridge to give way for a ferry, if the injury to navigation was great, and could in no other mode be obviated. As the states have exercised this power of erecting bridges across navigable streams over half a century, and in numerous cases, over navigable waters, where the tide ebbs and flows, in Maine, New Hampshire, Connecticut, New York, Pennsylvania, Delaware, &c., and congress have followed their example in the District of Columbia, any new and restrictive legislation by the general government would be unjust, if not suited to the exigencies of the case. and of course, go no further than is necessary to discharge its duties in relation to the powers confided to it for the benefit of the states and the people as a whole. Its true attitude is one not seeking collision, or being punctilious as to trifles, nor acting with harshness, where a fair exercise of ancient powers and usages has been indulged in. and where by a double government and some concurrent powers over like subjects, some difficulties are unavoidable, and are to be met always in a charitable, conciliatory and compromising spirit. It must act only in cases worthy the government of the whole Union, and in a manner becoming the government of the whole Union, dignus vindice nodus.

After such legislation, there would need be no grounds of jealousy or distrust as to its effect, as the laws will be made by our own delegates in the general government, under our own constitution, the cases tried, as in the states, by juries, rather than without, and by our own jurors, before our own judges, under our own ameliorated codes of law, and the punishments be as mild and suited to modern notions of civilization in the states. But in doing this, it would not be enough, as before suggested, for congress to vest jurisdiction in this court in all cases of mere admiralty and maritime crimes, even if enumerating and defining them when misdemeanors as well as felonies, because the power of congress over commerce is much broader as to both territory and subjects, than what belongs to admiralty courts as such. It is unrestricted as to commerce between the states as well as abroad, and is increased by the powers to maintain a navy, and defend the country by forts. and improve harbors, and make breakwaters and hospitals, and collect revenue on imports. Hence, it can extend to numerous cases, which in England were under the jurisdiction of other courts than the admiralty, and can well be entrusted to the circuit court, as is most of its other powers. not as admiralty ones. except appeals from the district tribunals. Nor will it be necessary in any of these cases, to make the jurisdiction exclusive of the state courts, except where the power that is executed by it is exclusive in its nature. In all other cases, the rights, and remedies, and duties and liabilities of our people can be taken care of in the state courts, except where the laws of the latter may conflict with those of congress on the same subject.

This opinion was mostly prepared before the decision in the case of Waring v. Clarke, 5 How. [46 U. S.] 441, although it was not delivered until after.